Reed, J.
At the very outset of the investigation we are embarrassed by want of data—by the failure of the pleader to state in the complaint certain important facts necessary to a proper understanding of the case and the equities of the parties. We should have been informed of the average volume of water flowing in the stream during the irrigating season, of the amount taken by appropriation prior to the appropriation of appellee in 1879,—whether there had been an adjudication and decree under the provisions of the statute, and the relative rights of priority and supply determined. We should also have been informed of the size, grade and estimated carrying capacity of the canal, and as near as practicable of the estimated loss of water in transmission by seepage and evaporation. These are all important factors in arriving at the equities of the parties and the construction of the contracts. Thej are, evidently, all elements and conditions that were known to the respective parties at the time of entering into the contracts, and it is presumed they were made with reference to such premises and existing conditions, but these facts were deemed by the pleader unimportant, hence, we are not informed.
It is alleged in the complaint, and urged and relied upon in argument, that The Larimer & Weld Irrigation Company (appellee), was and is a common carrier of water for irrigating purposes, and that its rights, duties aud obligations are to be determined on the assumption that that is its status. This theory is supposed to be asserted in and supported by the supreme court of this state in Wheeler v. Irrigation Co., 10 Colo. 582; Coffin v. Utah Co., 6 Colo. 448; Farmers etc. Co. v. Southworth, 13 Colo. 111, and Strickler v. Colo. Springs, 16 Colo. 61.
The law declared in those cases must be construed as applying only to the established facts of each ease. To attempt to generalize and give it application to all corporations *490 delivering water to consumers would be doing injustice to the court and the law. The application of the terra “ Com-, mon Carrier ” to such corporations was perhaps unfortunate. The name was probably adopted for want of a better. The anomalous and peculiar status of such corporation in some, aspects, or of some corporations in the functions exercised, approaching more nearly those of-a common carrier than any thing else, the name was applied. No competent court could or would attempt to assert that the functions, attributes and responsibilities of a canal company were identical with those of a common carrier, and in the opinion, the court in Wheeler v. Irrigation Co. (supra) guarded itself against this injustice in construction by saying
“ The Colorado doctrines of ownership and appropriation [as declared in the constitution, statutes and decisions), necessarily give the carrier of water an exceptional status; a status differing, in some particulars, from that of the ordinary common carrier. Certain peculiar rights are acquired in connection with the water diverted. It is unnecessary now, however, to enumerate these rights in detail. For the present it suffices to say that they are dependent, for their birth and continued existence, upon the use made by the consumer.” In a case like the present the facts and conditions stated in the complaint divest the appellee of every legal element necessary to constitute it a common carrier. Take the earliest definitions of a common carrier and we have:
“ To render a person liable as a common carrier he must exercise the business of carrying as a public employment, and must undertake to carry goods for all persons indiscriminately, and hold himself out as ready to engage in the transportation of goods for him as a business.” Coggs v. Bernard, 2 Ld. Raym. 909; Ingate v. Christie, 3 Car. & Kir. 61; Chit. on Carriers, § 15, adopted and recognized as correct in 1 Kent’s Com., § 40, p. 498; Story on Bail., § 495; Saterlee v. Groot, 1 Wend. (N. Y.) 272; Citizens Bank v. Nantucket Steamboat Co., 2 Story 17, and generally in all subsequent American decisions.
*491 And’s L. Die.—“Common Carrier, one who undertakes for hire or reward to transport the goods of such as choose to employ him, from place to place.” See Dwight v. Brewster, 1 Pick. (Mass.) 53.
“ If the carrier be employed in carrying for one or a definite number of persons byway of special undertaking he is only a private carrier.” Red. on Carriers, § 19.
These definitions are so elementary that they would not be stated, except for purposes of illustration to show that in the case presented the corporation is not brought within the definition, in any respect;' of either a common or private carrier, coming nearer the definition of private than common carrier, but lacking several, indispensable elements of either. In order to constitute a carrier of either class,—
1st. The goods or thing to he carried must be the property of the bailor.
2d. The thing must be delivered by the bailor to the carrier to he transported.
3d. The carrier must transport and deliver to the consignee the identical goods delivered to him for transportation.
4th. A person who contracts to transport and deliver to another at a given place a certain portion of a common lot of material to be separated from it at the place of the consumer, to which the consumer had no title prior to transportation and delivery, is in no legal sense a carrier, but a vendor of the commodity. Now, applying these axiomatic principles to the facts as pleaded, and we find that neither of appellants are alleged to have had any right or title by purchase, prior appropriation, application to a beneficial use, or otherwise, to any of the water appropriated, diverted and carried by the canal company at any time prior to the construction of the canal or prior to bringing suit that he could, or attempted to, deliver to the company for transportation. The water supply of the canal company (appellee) which it was to carry and deliver under its respective contracts was obtained by it, first, by the purchase and absorption of the *492 water rights formerly held by appropriation by the parties interested in old canal No. 10. (Neither the time when such rights were acquired, the relative priority of such rights nor the extent of such appropriations are stated.) Second, by the appropriation of any unappropriated water flowing in the river at the date of commencing the construction of the canal in March, 1879.
The right of appellant Thompson to water, as alleged in the complaint, is predicated upon the purchase of two water rights by contracts with the canal company; one executed by the company in April, 1880, of which he became the owner by purchase in December, 1881, the other acquired directly from the canal company, executed in February, 1882. The alleged rights of the Wyatts, appellants, to equitable relief are based upon the purchase by them of twenty-four water right contracts from the canal company, acquired in December, 1887. It is alleged that Thompson acquired the land upon which water was used in December, 1881, two years and a half after the appropriation of the water by the canal company, and the Wyatts became the owners of their land on the 16th of December, 1887, eight and one half years after such appropriation. Hence it becomes apparent that the relation the canal company bore to the plaintiffs was not that of a common carrier, to transport, for hire, a chattel to which they had a pre-existing title, and deliver the same to them for use upon the land, for no right to any water flowing in the stream is asserted by either. Their assertion of right to water is based entirely upon the contracts of the canal company to furnish, sell and 'deliver to them a given quantity of water at some point upon or near the land upon which it is to be used.
In the paragraph above quoted from the opinion of the supreme court in Wheeler v. Irrigation Co. the court used the following language: “ The Colorado doctrines of ownership and appropriation (as declared in the constitution, statutes and decisions) necessarily give the carrier of water an exceptional status; a status differing in some particulars *493 from that of the ordinary common carrier, certain peculiar rights are acquired in connection with the water diverted.” It is probably not necessary for the determination of that ease to point out in what respects the canal company differed from a common carrier, nor to define the peculiar right acquired by the diversion of the water, but the court, evidently feeling that unless there was some reservation or modification of the term, “ common carrier,” parties might be misled, (as they evidently were in this case,) and attach to the name a legal significance not intended, used the foregoing language as modifying or explaining. In attempting to apply the name in this case, the modification is necessarily so great as to deprive the corporation of every legal and fundamental element or requisite belonging to the name.
II. In the same case, (Wheeler v. Irrigation Co.,) after failing to define the “ exceptional status ” of canal companies, it is said: “ But giving these rights all due significance I cannot consent to the proposition that the carrier becomes a ‘ proprietor ’ of the water diverted.
“ A cursory reading of the statute might convey the impression that the legislature regarded the carrier as possessing a salable interest in this water. And the constitutional phrase, ‘ to be charged for the use of water,’ relating to the carrier’s compensation, might at first glance seem to recognize a like ownership in such use. But, construing all the provisions of that instrument bearing upon the subject in pari materia, the correctness of both of these inferences must be denied. The constitutional convention was legislating Avith reference to the necessities and practical wants of the people. And this body, in its wisdom, ordained that the OAA'nership of water should remain in the public, Avith a perpetual right to its use, free of charge, in the people.” By this it will be observed that the learned court, unfortunately, failed to find who, under the conditions and circumstances, if any one, had or could have a right of sale, a proprietary interest, or the right to control by an assumption of ownership, the water diverted.- Before there can be any compre *494 hensive and intelligent adjudication of water rights, it seems to me these important, fundamental questions, lying at the very base of all litigation, must be met and determined. In this case the questions, who is the proprietor of the water diverted? and what is the status of the canal company? have to be met.
It is declared in the constitution, art. 16, § 5: “ The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided.”
Sec. 6. “ The right to divert unappropriated waters of any natural stream for beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using the water for the same purpose.” * * * The provisions of the constitution are so plain that no construction whatever is needed. All unappropriated waters in the streams belong to the state,' the public, the people. Any person wishing to divert (appropriate) any unappropriated water for a beneficial use has a constitutional right to do so—that cannot be denied. The title, right, property, ownership remains in the state, in the public generally, until some person diverts it, appropriates it, segregates it from the volume of the stream and applies it to a beneficial use by some legal method. The title of the state, of the public, as to the water so appropriated, is then divested. The appropriator becomes the proprietor of the water or the use of the water—it is immaterial which term is used, they are in effect the same—and he remains the proprietor, owner of the use, so long as the beneficial use to which it was appropriated is continued. While it so remains it is the subject of exclusive ownership and control, the property of the appropriator in every legal aspect.
The error of the supreme court in the opinion occurs in the last clause of the last paragraph quoted above: “ The constitutional convention * * * ordained that • the owner *495 ship of water should remain in the public, with a perpetual right to its use, free of charge, in the people.” Here is an attempt to discriminate and make the “ public ” and the “people ” distinct and separate identities, one of whom is invested 'with the title, pei’petually, and the other perpetuahy invested with the right to use. If the two are separate and distinct there is error, for it requires the interpolation of the provision that the ownership of the water should remain in the public, inalienable. No such provision is contained in the constitution, nor is any such intention disclosed—the inference is the other way, that the ownership should pass to the people by the first appropriation to a beneficial use. As used in the constitution, do the words public and people designate different aggregate bodies, or are they identical, one and the same ?
And’s. L. Die. “ Public.—The body of the people at large, the people of the neighborhood; the community at large; the people.”
“ People.—Ordinarily, the entire body of the inhabitants of a state.”
Bouvier L. Die. “ Public.—The whole body politic or all the citizens of a state.”
“People.—A state; as the people of the state of New York. A nation in its collective and political capacity.” See Cooley Const. Lim., §29 to §37 (5th ed.) ; United States v. Quincy, 6 Pet. 467.
These authorities establish the absolute identity of the two supposed different bodies; make the terms “ people ” and “public” synonymous, and that they were so intended in the constitution is apparent. This obviates the whole difficulty; the title, and the “ perpetual right to its use free of charge,” are united and inseparable and eliminate the paradoxical situation of two titles, one—ownership in the public, and the other—the right to appropriate, use and control, in the people. It relieves the court from the embarrassment observable in the Wheeler case, where it was compelled to say: “ After appropriation, the title to this *496 water, save perhaps as to the limited quantity that may he actually flowing in the consumer’s ditch or lateral, remains in the general public, while the paramount right to its use, unless forfeited, continues in the appropriator.” We can hardly comprehend a legal situation where the right of a person, without title, to the use of a chattel, is paramount to that of the owner. If, as stated, the title remains in the public, inalienably, we are at a loss to ascertain how the title to the limited quantity actually flowing in the ditch or lateral passed to the consumer. If such be the fact, why does not the title to all the water flowing in a canal or ditch, be the quantity large or small, pass to the consumers as soon as diverted from the volume of the stream ?
There appears to be in the discussion of constitutional provisions a misapprehension in regard to the functions and character of a state constitution, in supposing that a constitutional convention can legislate and create new rights. According to all definitions, to legislate is beyond its power. The offices to be performed by a constitution are two. First, it is declaratory of rights inherent in the people, exercised by them, and existing long before its adoption; second, it is a limitation upon all legislative power preventing any subsequent interference with the declared rights, and perpetuating them.
“Written constitutions sanctify and confirm great principles, but the latter are prior in existence to the former.” 2 Webster’s Works, 392.
“ In considering state constitutions we must not commit the mistake of supposing that because individual rights are guarded and protected by them, they must also be considered as owing their origin to them. These instruments measure the powers of the rulers, but they do not measure the rights-of the governed.” Cooley Const. Lim. 47.
The following from the opinion in Hamilton v. St. Louis, county court, is adopted by Judge Cooley and incorporated in the text at page 47: “ Designed for their protection in the enjoyment of the rights and powers which they pos *497 sessed before the constitution was made, it'is hut the framework of the political goverriment, and necessarily based upon the pre-existing condition of laws; rights, habits, and modes of thought. * * '* A written constitution' is in every instance a limitation upon the powers of government in'the hands of agents.” See also 1 Black Com. 124; 2 Story, Life & Letters, 278; Matter of Oliver Lee & Co’s Bank, 21 N. Y. 9.
The history of water rights in this state will show that the’ rights and principles declared in the constitution were récognized and acted upon by the people years before they were formulated and declared in that instrument. That such rights had their inception in the earliest attempt at agriculture, when it was found that climatic conditions demanded the artificial use of water to pródüce crops. ■ The title of the public and the people to the water in the streams, and the right to divert and appropriate, were recognizéd and acted upon, the only requirement being an application to á beneficial use, and such rights to the use of.water as between different consumers or users were established upon the broad equitable basis that’preferences were to be controlled by the respective dates when the conflicting appropriations were made. ’ •
-When ’thus appropriated the party appropriating was regarded as having a proprietary interest,—a right of property in, and the title to the water appropriated and diverted, with the right to use, sell or loan it, like other property. By such appropriation and by reason of the diversion and separation of the water from the volume of the stream the title of the public or people was divested and the appropriator béc’amé the owner. Cleared of all embarrassment,- by reason of' the 'supposed double ownership, we find the rights declared in. the constitution to be the same that were recognized and acted upon by the people before its adoption.
Later decisions of the supreme court seem at variance with the leading ease, (Wheeler v. Irrigating Co.,) arid seem to sustain our contention, that by appropriation, diversion and *498 application to a beneficial use the canal company, the appropriator, has a proprietary right to the water diverted. It is unimportant by what name such right is designated—the party has the control subject to the law and rights of others; he has property in a commodity that he can deal with, transfer and deliver to the consumer or user. This view appears to be sustained in Fuller v. Swan River Co., 12 Colo.12, where the following, from the opinion in Davis v. Gale, 32 Cal. 27, is cited and approved:
“ Appropriation, use and non-use are the tests of his rights; and place of use, and character of úse, are not. When he has made his appropriation he becomes entitled to the use of the quantity which he has appropriated at any place where he may choose to convey it, and for any useful and beneficial purpose to which he may choose to apply it. Any other rule would lead to endless complications and most materially impair the value of water rights and privileges.” The language here used is absolutely incompatible with the theory that the appropriator has not a proprietary interest in and title to the water appropriated.
In Farmers etc. Co. v. Southworth, 13 Colo. 119, 120, in the opinion of Helm, C. J., it is said :
“Does the ‘priority of appropriation,’ which by virtue of the constitution gives the better right, apply to individual consumers taking water through the agency of a carrier, so that, notwithstanding the pro-rating statute, each consumer acquires a separate constitutional priority of right, entitled to judicial enforcement, dating from the beginning of his specific use ?
“ If this question be answered affirmatively, the statute is void and the complaint states a- cause of action ; if answered in the negative, the statute is in this respect valid and the demurrer should have been sustained. * * *
“ The constitution recognizes priorities only among those taking water from natural streams. Therefore, to constitute an appropriation such as is recognized and protected by that instrument, the essential act of diversion, with which is coup *499 led the essential act of use, must have reference to the natural stream. But the consumer himself makes no diverson from the natural stream. The act of turning water from the carrier’s canal into his lateral cannot be regarded as a diversion within the meaning of the constitution; nor can this act of itself, when combined with the use, create a valid constitutional appropriation. There is therefore no escape from the conclusion hitherto announced by this court, that in cases like the present the carrier’s diversion from the natural stream must unite with the consumer’s use in order that there may be a complete appropriation within the meaning of our fundamental law. Wheeler v. Irrigation Co., supra.
“ The carrier makes a diversion both in fact and in law. This diversion is accomplished through an. agency (the carrier) recognized by the constitution and statutes, and for purposes expressly named in both; hence, it cannot be challenged as illegal. It would undoubtedly become unlawful were the water diverted not applied to beneficial uses within a reasonable time; but, when thus applied, the diversion unquestionably ripens into a perfect appropriation.
“ If the consumer applied water to a beneficial use within a reasonable time after the carrier’s diversion, the appropriation relates for its priority back to such diversion.”
If we can be allowed the criticism, we would say we cannot fully agree with that portion of the language quoted. “ The carrier’s diversion from the natural stream must unite with the consumer’s use in order that there may be a complete appropriation within the meaning of our fundamental law.” The requirement of the constitution is fulfilled when the water is diverted for a beneficial use, when a corporation diverts and legally appropriates the water, constructs a canal thirty to fifty miles in length as a vehicle for the transportation of the water to arid desert lands, conveys and delivers the water to actual users of it for the purposes of irrigation, and all the water carried is delivered and used— there can be no question in regard to the beneficial use for which the appropriation was made,,nor do we think that the *500 acts of the canal company must combine with the acts of the user of water to constitute a beneficial use. Such beneficial use is complete by the acts of the canal company. If it could be shown that the water diverted and carried in the canal was misapplied, wasted, or anj portion of it, to the extent of such misapplication or waste, the appropriation and volume of water could be legally diminished and all water not applied to beneficial use would revert.
If the leading case (Wheeler v. Irrigation Co.) is not overruled, its authority is greatly weakened by Striekler u. Oolo. Springs, in the supreme court of this state, 16 Colo. 61. This case certainly plainly declares the principle we contend for, viz: That the right to water by appropriation and diversion is property. It is said by Hayt, J., “ The authorities seem to concur in the conclusion that the priority to the use of water is a propel^ right. To limit its transfer * * * would, in many instances, destro) much of its value.” Again, “ if the- priority to the use of water for agricultural purposes is a right of property, then the right to sell it is as essential and sacred as the right to possess and use.”
It is said in Gould on Water Rights, § 234, “ The right to water acquired by priority is the subject of property and may be sold and conveyed. In Pom. on Rip. Rights, § 58, “ The exclusive right to diversion if effected, may be transferred and conveyed like other propert3 or rights analagous to property.” The Striekler case goes farther than it is necessary for us to go for the purposes of this case, as the questions are not presented. It is held, that the right to the use of water, acquired by prior appropriation and diversion, applied to the land of the appropriator and then used for years, is a property severable and distinct from the land, that could be sold and eonve3md to another to be used for another and different purpose; that when necessary to the enjoyment of the right the point of diversion may be changed to a higher point on the stream, the water carried in a new and different channel, delivered at a different place, and be used for a different beneficial purpose. This, logically, carries the ques *501 tion of proprietary right and ownership farther than we need go; contains propositions we do not care to indorse or deny. We are at a loss, when we attempt to harmonize these conclusions with the following statement in the opinion,—“ We grant that the water itself is the property of the public.” They cannot be harmonized except through the metaphysical distinction between the ownership of the water and'the right of its use. If the right to the use of water carries with it an absolute control of it, with the right to divert, carry, apply, consume and sell the water—and is property that can pass by sale and transfer, so as to give the purchaser a legal right to re-divert at another place, re-convey in a different channel, and consume in another way, it must be a matter of indifference to the owner of the “ right ” who owns the water. There can be on the part of the owner no assertion of any right pertaining to ownership and property, no reversion. The public holds the naked title divested of all the attributes of ownership. The distinction attempted to be drawn between the right to use water and the title to it is purely mythical and imaginary, and the sooner it is dropped and the two treated as identical the better, and less confusion will exist. If the doctrine in the Striekler ease is the correct one, then the title to water and the right to its use are identical, and it is a chattel, a commodity, and is subject to the same legal rules that govern other personal property, and is at once stripped of all embarrassing technicality.
That a corporation is a person, under the law—is one of the public to whom water is dedicated, must be conceded. Its rights are recognized and protected by statute. By prior appropriation and diversion for a beneficial purpose, it becomes the proprietor, has a property right. It can control it as a chattel, can convey, contract, deliver and sell the use, at least, of the water. That by reason of its franchise from the state and its quasi public character it is a corporation of the character that can be subjected to proper legislative control must be conceded.
Under the facts stated in the complaint, we conclude:
*502 First. That the canal company is, in no legal sense, a common or private carrier.
Second. That the canal company, by reason of its diversion, appropriation and the application of the water to a beneficial use, became the proprietor of the water, and as such could sell, transfer and deliver it to be used by those who required it for irrigation, and that such right could only be defeated by a subsequent failure to apply it or cause it to be applied to a beneficial use.
Third. That the users of water from the canal, under the contracts, having made no appropriation of water from a natural stream and asserted no right to water prior to the appropriation by the canal company, have no constitutional or statutory rights, by virtue of citizenship, that can be enforced against the corporation. That the right to water does not attach to the person by reason of his supposed ownership, as one of the public, as urged in argument, and can only be acquired by prior appropriation.
Fourth. It is shown by the complaint that the appropriation and diversion of the water by the canal company antedated, by several years, the title of complainants to the land on which the water was used; that such lands were many miles from the stream; that by reason of the diversion, appropriation and conveyance of the water by the canal company, and their ability to acquire water from the company to reclaim and utilize the land, lands otherwise worthless for agriculture became valuable and were purchased by the complainants, and contracts for water necessary to the reclamation of the lands were entered into with the canal company. That the rights of the complainants to equitable relief must depend, solely, upon the construction of the contracts made by them with the canal company, and that there is no constitutional question involved and necessary to be determined, as supposed and urged in argument.
III. It is contended by appellants that under the contracts made with the canal company the amount of water pertaining to each eighty-acre right purchased, to be delivered by the *503 company and measured in the manner designated in the contract, was to be one and forty-four hundredths cubic feet per second, and that such quantity was not subject to diminution for natural or other causes. We cannot so construe the contracts. The first clause to be considered is, “ The said company agrees when it shall have sold an outstanding and in force a number of water rights equal to the estimated capacity of the company’s canal to furnish water, it will then issue and deliver to the holder of each water right who shall have complied with the terms of this contract, without further consideration, four shares of the stock of said company for every water right hereby sold which the purchaser hereof agrees to accept.” It will'be observed that this paragraph, quoted and' relied upon, is in no way connected .with the clauses of the contract of sale of the water right, nor is it intended to define the extent of the right,—contains no covenant or agreement whatever to deliver any water. By the purchase of rights the purchaser acquired no proprietary interest in the canal or to any water appropriated by the canal company, except the amount agreed to be delivered. The company retained absolute control of the appropriation of water at the stream and the canal, until by sales of rights it had become reimbursed and made its excepted profits on the investment, then, by the" issue of four shares of stock for each right, the entire property, rights and franchise were to pass to the owners of the rights. Why the above paragraph is quoted and relied upon as defining the quantity of water disposed of in the preceding paragraph we are at a loss to know. If the quantity were definitely expressed, which it is not, it could at most be only regarded as an aid in construing the clauses of purchase and sale, but we cannot construe the sentence in the manner contended, The “ capacity ” of the canal is a well understood term in engineering. It is the volume of water it is capable of conveying, estimated upon width, depth and grade. Its capacity is the same with or without water. Its capacity is no more to be determined by the amount of water in it at any time than the capacity *504 of a box-car by the limited amount of goods it may at any time contain. Supply and capacity are separable and distinct terms in no way dependent upon each'other. The word “ furnish,” taken alone in the connection in which it is used, might be deemed the equivalent of and meaning the same as supply,--but the clause in'which it occurs is continuous, not separated by punctuation, and the word finish is modified," explained and controlled by the preceding words “ est'iiiiated capacity,” showing conclusively that the contracts were predicated upon the estimated carrying capacity of the canal, which was capable of mathematical demonstration, and. not upon the supply of water which would of necessity be fluctuating and changing from day to day.
■ The entire contract is not set out in the complaint. The paragraph defining the quantity of water to each water right is omitted, but the substance' is stated by the pleader. An' examination of the complaint will show it to have been, adroitly drawn, an attempt to supply by inference and deduction ' the place of direct allegations. It is nowhere directly alleged that the quantity of water sold and bought was the absolute and arbitrary quantity of One and forty-four one hundredths cubic feet per second, to an eighty-acre water right, and the language used' by the pleader in the second paragraph will show that he, at that time, did not regard the quantity to each right as definite and fixed. It is, “ That all written contracts made by the defendant *' * * with water consumers and appropriators * * * have mentioned as a unit of comparison and measurement what is known as an eighty-acre water right, which' is defined in all such contracts as one and forty-four one hundredths cubic feet of water per second,” etc. The construction of the contract contended for is not strengthened or supported by the language contained in the seventh and eighth paragraphs of the contract, which are fully set out in the complaint. In the seventh the company exonerates. itself.' from all damage. “ In case the canal- of said company shall be unable to carry and distribute a volume -of *505 water equal to its “ estimated.capacity ” either from casual or unforeseen or unavoidable accident, or if the. volume of water prove Insufficient from drouth or from any other cause beyond the control of said company,” etc.. Here- the wprds “estimated capacity ” are-again used and'must.be. applied to. the canal and not to the water-supply. . '.
In the eighth paragraph fhe language of the contract' is,: “ It is further agreed that if, by reason, of any causes, .the supply of water shall be insufficient to fill and flow through, said canal, according to its ¿stimated. capacity,” etc.,, and provision is made for pro-rating the water actually carried. Here the distinction between capacity and supply is clearly drawn and recognized by the parties contracting, and -treated as distinct and separate factors.
We are forced to conclude that no. fixed, definite quantity, of water was sold or contracted as ah eighty-acre water right; that the quantity actually contracted to be delivered was the supply the canal company could control, not exceeding the capacity of the canal, to be divided pro rata■ among the contracting users on all rights sold and outstanding at any time, with the power and reserved right in the, canal company to sell water rights based upon the éstimated carrying capacity of the canal until such estimated limit. was reached,, and that the parties contracted upon such basis. To hold differently, would require the court to expunge the. words used in contracting and substitute others. It would not be the construction of an existing contact, but the reformation of it.
It is to be presumed that appellants and others contracting with the corporation, as intelligent business men, familiarized themselves with the premises and conditions, of the capacity of the ditch, the different priorities from the Stream', the probable amount of supply the ditch could control and. the amount of land under the ditch intended to. be supplied from it. That they were aware of the intention of the company to sell rights, the same as' they purchased, until the' estimated capacity was reached, is conceded in the confpláint.
*506 It has already been shown and supported by well considered authority that the users of water under contracts made with the canal company were not appropriators within the provisions of the constitution. First, for the reason that no appropriation could be made except from the stream; second, that their entire right to water .was by virtue of the contracts with the appropriator, the canal company. It follows that there could not be any preference to right of use to water, as is urged and supposed by appellants, by reason of having first contracted and made earlier actual application of water to the land. No rights acquired under the contracts could raise the constitutional or statutory question of priority, or create a right that could be enforced against the canal company as between the different users of water and contractors, all having dealt upon the same basis and with knowledge of the intention of the company to dispose of rights to the extent of the estimated capacity of the canal. Were such a contention to prevail the management of the ditch and distribution of water would be impracticable if not impossible. The rights of appellants to water having been acquired, as stated, seven or eight years after the construction of the canal, the application of the doctrine might result in allowing the entire water supply to be used by parties whose contracts were executed prior in date to those held by appellants, to their exclusion.
This court is asked, in effect, by injunction, to restrain the canal company from selling any inore water rights or applying water from its canal, or allowing it to be applied to any additional lands, alleging that the supply of water under the control of the company is not in excess of or equal to one and forty-four one hundredths cubic feet per second for each of the three hundred sixty-six and one half rights sold and outstanding at the time of instituting the suit, and asking the court, by decree, to declare that each purchased water right was an absolute right to one and forty-four one hundredths cubic feet per second, and that all the water carried by the canal company be divided between the three
*507 hundred sixty-six and one half rights outstanding, unless the quantity should exceed their supposed limit. In our view of the ease, under the premises stated, the relief asked is far heyond the power of a court of equity to grant. It would be, in effect, to abrogate the contracts made and substitute new ones made by the court, never contemplated by either of the parties when the contracts were made. The right of the canal company to sell water rights until the estimated carrying capacity of the canal was reached was expressly reserved, and the parties dealing with it acquiesced with full knowledge of the reservation and intention, and must be held to have contracted with reference to it. The supposed wrongs cannot be reached or rectified by injunction. The court, under the contracts, is powerless to decree preferences to earlier purchasers, or that such purchasers shall have one and forty-four one hundredths cubic feet of water for each right, regardless of supply or the rights of subsequent purchasers whose contracts stand upon the same basis; nor, with the provision for pro-rating incorporated into and forming a part of the contract, can it decree that the water shall not be pro-rated among all the rights contemplated until the limit of the estimated carrying capacity of the canal is reached, nor can the court say that one party shall not sell any supposed right or property or another buy. If, by reason of the use of the thing sold, the vested rights of others are interfered with and the value of such rights diminished, a court of equity can enjoin the use, but not the sale. It follows that the judgment of the district court in sustaining the demurrers to the complaint for want of equity was correct.

Affirmed.

Bissell, J., dissenting.