754 F.2d 1555
 PUBLIC SERVICE COMPANY OF COLORADO, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
COLORADO RIVER WATER CONSERVATION DISTRICT, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
PUBLIC SERVICE COMPANY OF COLORADO, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
 Nos. 82-2119, 82-2180 and 84-1343.
 United States Court of Appeals,
Tenth Circuit.
 Feb. 15, 1985.
 
 Donald H. Hamburg, Gen. Counsel, Glenwood Springs, Colo. (Robert L. McCarty and Michael N. McCarty of McCarty, Noone & Williams, Washington, D.C., with him on the brief), for petitioner Colorado River Water Conservation Dist.
 Andrea Wolfman, Atty., Washington, D.C. (William H. Satterfield, Gen. Counsel, Stephen R. Melton, Acting Gen. Counsel, and Jerome M. Feit, Sol., Washington, D.C., with her on the briefs), for respondent F.E.R.C.
 James R. McCotter, Denver, Colo. (Timothy J. Flanagan, Denver, Colo., with him on the briefs) of Kelly, Stansfield & O'Donnell, Denver, Colo., for petitioner Public Service Co. of Colorado.
 Before BARRETT, DOYLE and SEYMOUR, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 The Public Service Company of Colorado (PSC) and the Colorado River Water Conservation District (CRWCD), an intervenor in the administrative proceedings, petition this Court for review of two orders of the Federal Energy Regulatory Commission (FERC). In its "Order Providing For Hearing," Docket No. HB24-63-3, February 10, 1982, 18 FERC p 61,110, FERC determined that PSC was liable to pay the United States for headwater benefits received at PSC's Shoshone Hydroelectric Plant from the United States' Green Mountain Reservoir, pursuant to section 10(f) of the Federal Power Act, 16 U.S.C. Sec. 803(f) (1982). R. Joint Appendix, p. 35/119. In its "Opinion No. 200, Opinion Reversing Initial Decision And Dismissing Request For Rehearing," Docket No. HB-24-63-3-000, December 21, 1983, 25 FERC p 61,399, FERC determined that PSC must reimburse the United States for costs incurred in the headwater benefits investigation that had been undertaken, again pursuant to section 10(f) of the Federal Power Act, 16 U.S.C. Sec. 803(f) (1982). R.Supp. Joint Appendix, p. 186/790. FERC denied the parties' requests for rehearing on both of these orders, R.Supp. Joint Appendix, p. 210/817; R. Joint Appendix, p. 56/162. This Court has jurisdiction to entertain the petition for review of these orders pursuant to section 313 of the Federal Power Act, 16 U.S.C. Sec. 825l (1982).
 
 
 2
 This case involves two installations on the Colorado River system in Western Colorado, and their relationship to each other. The first installation is the Shoshone Hydroelectric Plant, located on the Colorado River itself, on public lands approximately ten miles east of the town of Glenwood Springs, Colorado. It consists of a diversion dam on the river, a gravity tunnel 2 1/3 miles long through which the river's water can be diverted, and a power house where the diverted water under hydrostatic head is used to generate electricity. The Shoshone Plant is a "run-of-the-river" facility, meaning that no water is actually stored there. The Shoshone Plant's operation depends on the direct flow of the river; when the river's flow is less than 1250 cubic feet per second (c.f.s.),[1] the Plant's electrical generating capacity is diminished. No water is actually consumed by the Plant's power production operation. The Shoshone Plant was built pursuant to a right-of-way permit by the Secretary of the Interior in 1903, allowing PSC's predecessor, the Central Colorado Power Company, to enter onto the public lands. The Secretary had allowed entry pursuant to a February 15, 1901 Act, 31 Stat. 790.[2] Since this was before the 1920 passage of the Federal Water Power Act, no license from the Federal Power Commission was necessary to construct the Shoshone Plant.
 
 
 3
 The Shoshone Plant was completed and began operation in 1909. It has an adjudicated water right of 1250 c.f.s. with a priority date of January 7, 1902, which is the oldest industrial water right on the Colorado River. The only water rights on the river that are senior to the Shoshone Plant's are for agricultural uses in Colorado's Grand Valley, downstream from the Plant.
 
 
 4
 The second installation involved in this case is Green Mountain Reservoir, a water storage facility operated by the Bureau of Reclamation, United States Department of the Interior. It lies on the Blue River, a tributary of the Colorado River, approximately 16 miles southeast of the town of Kremmling, Colorado. The dam and reservoir are approximately eight miles above the confluence of the Blue and Colorado Rivers, about one hundred miles upstream from the Shoshone Plant. Green Mountain Reservoir is part of the Colorado-Big Thompson Project, an elaborate system of reclamation facilities constructed to divert water from the Colorado River on Colorado's Western Slope across the Continental Divide onto Colorado's Eastern Slope. The Colorado-Big Thompson Project was authorized and funded by an Act of Congress on August 9, 1937, 50 Stat. 564, 595 (1937). The Act provided that construction would be in accordance with the plan described in Senate Document Number 80, 75th Congress, 1st Session (Senate Document 80). Senate Document 80 describes, among other things, the planned facilities and the manner in which they will be operated. The document provides in pertinent part as follows:
 
 
 5
 MANNER OF OPERATION OF PROJECT FACILITIES AND AUXILIARY FEATURES
 
 
 6
 The construction and operation of this project will change the regimen of the Colorado River below the Granby Reservoir. The project contemplates the maximum conservation and use of the waters of the Colorado River, and involves all of the construction features heretofore listed. In addition thereto certain supplemental construction will be necessary. This will be for the primary purpose of preserving insofar as possible the rights and interests dependent on this water, which exist on both slopes of the Continental Divide in Colorado. The project, therefore, must be operated in such a manner as to most nearly effect the following primary purposes:
 
 
 7
 1. To preserve the vested and future rights in irrigation.
 
 
 8
 2. To preserve the fishing and recreational facilities and the scenic attractions of Grand Lake, the Colorado River, and the Rocky Mountain National Park.
 
 
 9
 3. To preserve the present surface elevations of the water in Grand Lake and to prevent a variation in these elevations greater than their normal fluctuation.
 
 
 10
 4. To so conserve and make use of these waters for irrigation, power, industrial development, and other purposes, as to create the greatest benefits.
 
 
 11
 5. To maintain conditions of river flow for the benefit of domestic and sanitary uses of this water.
 
 
 12
 In order to accomplish these purposes the project should be operated by an unprejudiced agency in a fair and efficient manner, equitable to all parties having interests therein, and in conformity with the following particular stipulations:
 
 
 13
 (a) The Green Mountain Reservoir, or similar facilities, shall be constructed and maintained on the Colorado River above the present site of the diversion dam of the Shoshone power plant, above Glenwood Springs, Colo., with a capacity of 152,000 acre-feet of water, with a reasonable expectancy that it will fill annually. Of said capacity, 52,000 acre-feet of water stored therein shall be available as replacement in western Colorado, of the water which would be usable there if not withheld or diverted by said project; 100,000 acre-feet shall be used for power purposes; and all of said stored waters shall be released under the conditions and limitations hereinafter set forth.
 
 
 14
 (b) Whenever the flow in the Colorado River at the present site of said Shoshone diversion dam is less than 1,250 cubic feet per second, there shall, upon demand of the authorized irrigation division engineer or other State authority having charge of the distribution of the waters of this stream, be released from said reservoir as a part of said 52,000 acre-feet, the amount necessary with other waters available, to fill the vested appropriations of water up to the amount concurrently being diverted or withheld from such vested appropriations by the project for diversion to the eastern slope.
 
 
 15
 (c) Said 100,000 acre-feet shall be stored primarily for power purposes, and the water released shall be available, without charge, to supply existing irrigation and domestic appropriations of water, including the Grand Valley reclamation project, to supply all losses chargeable in the delivery of said 52,000 acre-feet of water, and for future use for domestic purposes and in the irrigation of lands thereafter to be brought under cultivation in western Colorado. It shall be released within the period from April 15 to October 15 of each year as required to supply a sufficient quantity to maintain the specified flow of 1,250 cubic feet per second of water at the present site of said Shoshone diversion dam, provided this amount is not supplied from the 52,000 acre-feet heretofore specified. Water not required for the above purposes shall also be available for disposal to agencies for the development of the shale oil or other industries.
 
 
 16
 * * *
 
 
 17
 * * *
 
 
 18
 Senate Document Number 80, 75th Congress, 1st Session, pp. 2-3, R. Joint Appendix, pp. 65/174-66/175; See also Senate Document Number 80, Senate Miscellaneous Reports, 75th Congress, 1st Session (1937).
 
 
 19
 The document can be fairly characterized as a compromise between the respective water interests of Colorado's Eastern and Western Slopes. Under its terms, the Eastern Slope was to get the Alva B. Adams transmountain diversion tunnel (diverting from Grand Lake near the town of Granby, Colorado) and several smaller storage facilities and canals to be built on the Eastern Slope. The Western Slope was to get Green Mountain Reservoir, which would store 52,000 acre-feet of water during the spring runoff season and then release that stored water into the Colorado River system to replace the water being diverted to the Eastern Slope. Additionally, Green Mountain Reservoir would store 100,000 acre-feet of water for purposes of power production at the site. When this stored water was released, it would be available to appropriators for irrigation and domestic purposes downstream without charge. This method of operation is in contrast with the usual method of operation of water storage facilities, where a specific amount of stored water is delivered to a specific downstream user in accordance with a water delivery contract, and the downstream user pays the storage facility for that amount of stored water when it is delivered.
 
 
 20
 Green Mountain Reservoir was completed in 1942, at which time several of the appropriators involved commenced water adjudication proceedings in the District Court of Summit County, Colorado, to determine relative priorities for purposes of irrigation (Civil Action No. 1805) and for purposes other than irrigation (Civil Action No. 1806). The United States and the Northern Colorado Water Conservancy District (the Eastern Slope appropriators) joined those proceedings by filing "Statements of Claim." However, the United States later instituted parallel water adjudication proceedings in the United States District Court for the District of Colorado and withdrew from the state court proceedings. The state adjudication eventually reached the Supreme Court of Colorado in City and County of Denver v. Northern Colorado Water Conservancy District, 130 Colo. 375, 276 P.2d 992 (1954). The Colorado Supreme Court remanded the case with instructions that the state district court adjudicate the United States' storage and direct flow water rights at Green Mountain Reservoir. By this time, the McCarran Amendment, Pub.L. No. 82-495, Sec. 208(a)-(c), 66 Stat. 549, 560 (1952), codified at 43 U.S.C. Sec. 666 (1982), had been enacted. Accordingly, the United States could be and was served as a party in the state court proceeding. The United States responded by removing the entire case to federal district court where the state docket numbers 1805 and 1806 (the private parties' irrigation and nonirrigation claims) were reassigned docket numbers 5016 and 5017 and consolidated with the United States' earlier action, Civil Action No. 2782. This proceeding became known as the "Consolidated Cases."
 
 
 21
 The parties eventually settled the case by stipulation in 1955. The federal district court incorporated the settlement agreement into its "Findings of Fact, Conclusions of Law and Final Decree," entered on October 12, 1955. R. Joint Appendix, p. 95/204. The decree issued by the court became known as the "Blue River Decree," under which Green Mountain Reservoir was awarded a direct flow water right of 1726 c.f.s. and a storage water right of 154,645 acre-feet, both with a priority date of August 1, 1935. The Blue River Decree also incorporated Senate Document 80 by reference and repeated the language of that document describing the manner in which the Colorado-Big Thompson facilities, including Green Mountain Reservoir, were to be operated. The history of this litigation is also discussed in United States v. Northern Colorado Water Conservancy District, 608 F.2d 422 (10th Cir.1979), and in United States v. Martin, 267 F.2d 764 (10th Cir.1959).
 
 
 22
 The terms of the Blue River Decree were approved by Congress in 1956 in the Colorado River Storage Project Act, Pub.L. No. 84-485, 70 Stat. 105, 110 (1956), codified at 43 U.S.C. 620j (1982). The effect of this Congressional approval is that the terms of Senate Document 80, as incorporated in the Blue River Decree, have the force of a statute and still control the manner in which Green Mountain Reservoir is to be operated.
 
 
 23
 We now discuss the statutory authority upon which FERC based its assessment of headwater benefits against PSC's Shoshone Plant. In 1920, Congress enacted the Federal Water Power Act, Pub.L. No. 66-280, 41 Stat. 1063 (1920), now codified at 16 U.S.C. 791a et seq. (1982). Prior to the passage of this Act, federal control over water power was characterized by duplicative and overlapping jurisdiction exercised by the Department of War, the Department of Agriculture, and the Department of the Interior. Monongahela Power Co. v. Alexander, 507 F.Supp. 385, 387 (D.D.C.1980). The Federal Water Power Act gave exclusive licensing authority for hydroelectric projects on the navigable waters of the United States to a newly created federal agency, the Federal Power Commission (FPC).[3] In First Iowa Hydroelectric Cooperative v. Federal Power Commission, 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143 (1946), the Supreme Court examined the purposes of the Federal Water Power Act and found that:
 
 
 24
 It was the outgrowth of a widely supported effort of the conservationists to secure enactment of a complete scheme of national regulation which would promote the comprehensive development of the water resources of the Nation, insofar as it was within the reach of the federal power to do so, instead of the piecemeal, restrictive, negative approach of the River and Harbor Acts and other federal laws previously enacted. Id. at 180, 66 S.Ct. at 919.
 
 
 25
 In section 10(f) of the Federal Water Power Act, authority was given to the FPC to assess licensees of downstream hydroelectric facilities for headwater benefits created by the construction of other licensed projects upstream. The term "headwater benefits" refers to the situation in which an upstream reservoir, through a program of water storage and subsequent controlled release, alters the natural flow of a river in such a way as to allow a downstream hydroelectric facility to generate more electric power than would otherwise be possible. This is accomplished primarily by augmenting the natural flow of the river with released storage water during seasons when the natural flow would otherwise not be sufficient to allow the downstream facility to operate at full capacity. The concept of assessing downstream licensees for headwater benefits was described in detail in an opinion by the FPC:
 
 
 26
 Congress in the enactment of Sec. 10(f) of the Power Act intended to encourage the orderly and comprehensive development of watersheds having power value through financial contributions by lower licensees who benefit from upstream improvements where upper storage reservoirs or other headwater improvements will result in a more nearly uniform or desirable flow than is available under natural conditions. The section contemplates that where lower licensees and other power developers are benefited they shall participate in the financial burden incident to the orderly and systematic construction of power and storage facilities of a river basin. Such financial support of headwater improvements by downstream beneficiaries extends the feasible limits of such improvements in the common interest. The act imposes upon the Commission the task of equitably apportioning the annual charges for interest, maintenance and depreciation of the upper headwater improvements so that each beneficiary may contribute its just share for the construction of such upper improvements of common benefit. Re Southern California Edison Co., Ltd., 1 FPC 567, 574 (1939).
 
 
 27
 In the Public Utility Act of 1935, Pub.L. No. 74-333, Ch. 687, 49 Stat. 803 (1935), Congress changed the name of the Federal Water Power Act to the Federal Power Act, amended section 10(f) so that both licensees and pre-1920 federal permittees could be assessed headwater benefits, Grand River Dam Authority v. Federal Power Commission, 246 F.2d 453, 455 (10th Cir.1957), and added a second part to the Act dealing with the regulation of certain electric utility companies. Section 10(f) now reads as follows:
 
 
 28
 (f) That whenever any licensee hereunder is directly benefited by the construction work of another licensee, a permittee, or of the United States of a storage reservoir or other headwater improvement, the Commission shall require as a condition of the license that the licensee so benefited shall reimburse the owner of such reservoir or other improvements for such part of the annual charges for interest, maintenance, and depreciation thereon as the Commission may deem equitable. The proportion of such charges to be paid by any licensee shall be determined by the Commission. The licensees or permittees affected shall pay to the United States the cost of making such determination as fixed by the Commission.
 
 
 29
 Whenever such reservoir or other improvement is constructed by the United States the Commission shall assess similar charges against any licensee directly benefited thereby, and any amount so assessed shall be paid into the Treasury of the United States, to be reserved and appropriated as a part of the special fund for headwater improvements as provided in section 810 of this title.
 
 
 30
 Whenever any power project not under license is benefited by the construction work of a licensee or permittee, the United States or any agency thereof, the Commission, after notice to the owner or owners of such unlicensed project, shall determine and fix a reasonable and equitable annual charge to be paid to the licensee or permittee on account of such benefits, or to the United States if it be the owner of such headwater improvement. 16 U.S.C. Sec. 803(f) (1982).
 
 
 31
 With this statutory and historical background, we now consider the issues that have been raised by the challenge of the PSC and the CRWCD to FERC's headwater benefits assessment against the Shoshone Plant. The issues are as follows:
 
 
 32
 1. Is FERC without jurisdiction to assess headwater benefits against the Shoshone Plant because the Plant operates under a pre-1920 permit?
 
 
 33
 2. Is the assessment of headwater benefits against the Shoshone Plant in derogation of its water rights under Colorado law and therefore a taking without just compensation in violation of the Fifth Amendment to the United States Constitution?
 
 
 34
 3. Is the assessment of headwater benefits against the Shoshone Plant precluded by the terms of Senate Document 80?4. If the assessment of headwater benefits against the Shoshone Plant was proper and in accordance with law, is PSC also obligated to reimburse FERC under section 10(f) of the Federal Power Act for costs incurred in making this particular headwater benefits determination?
 
 I.
 
 35
 We first consider whether FERC has jurisdiction to assess headwater benefits against PSC's Shoshone Plant. PSC contends that FERC has no such jurisdiction, for the reason that the Plant holds no Federal Power Act license but rather operates under a 1903 permit. PSC relies on the case of United States v. Colorado Power Co., 240 Fed. 217 (D.Colo.1916), for the proposition that PSC's rights were completely fixed and determined by the Act of February 15, 1901 alone. The court in that case did make such a statement, but further stated that Colorado Power Company (PSC's predecessor in interest) never had more than a revocable permit. The court held that the Secretary of the Interior could lawfully assess the Company a charge based on the amount of electricity it produced. The Act, said the court, did not specify burdens that the Secretary was or was not empowered to impose for the use of the permit, and in this instance the Secretary's charges were within his power. We note that the Act, as originally enacted, referred only to regulation by the Secretary of the Interior:
 
 
 36
 "... That the Secretary of the Interior be, and hereby is, authorized and empowered, under general regulations to be fixed by him, to permit the use of rights of way through the public lands ...." 31 Stat. 790 (1901).
 
 
 37
 It would be inappropriate to interpret this language as being continuously exclusive in nature, however, because it was written before Congress created the FPC and vested comprehensive jurisdiction over existing and planned hydroelectric projects in the new agency. In 1935, Congress gave the FPC jurisdiction to make headwater benefits assessments against pre-1920 permittees by adding the following language to section 10(f): "Whenever any power project not under license is benefitted ... the Commission ... shall determine and fix a reasonable and equitable annual charge to be paid...." Pub.L. No. 74-333, Sec. 10, 49 Stat. 843 (1935). The pertinent legislative history shows that it was Congress' intent to bring existing hydroelectric plants operating under pre-1920 permits under FPC jurisdiction, thereby removing the inequities involved in subjecting post-1920 licensees and not pre-1920 permittees to these assessments. See H.R.Rep. No. 1318, 7th Cong. 1st Sess. at 25 (1935); S.Rep. No. 621, 74th Cong. 1st Sess. at 45 (1935); accord, Grand River Dam Authority v. Federal Power Commission, supra. In enacting the 1935 amendments, Congress further accomplished the transfer of jurisdiction over hydroelectric projects from the Department of the Interior (along with the Department of War and the Department of Agriculture) to the FPC. The Act of February 15, 1901, although it mentions only the Department of the Interior, does not forbid Congress from subsequently transferring jurisdiction over the permittee from one agency to another; to read into the 1901 Act a bar against the subsequent transfer of regulatory jurisdiction would be to frustrate the intent of Congress when it enacted the 1935 amendments to the Federal Water Power Act, and this we cannot do.
 
 II.
 
 38
 PSC contends that it has, under the State of Colorado's prior appropriation doctrine, a vested property right to divert and apply to beneficial use, without charge, its full appropriation of 1250 c.f.s. whenever the river contains that amount of water and its water right is in priority. Consequently, FERC's assessment of headwater benefits against PSC's Shoshone Plant when the Plant has done no more than exercise its rights under Colorado law, is, according to PSC, an unconstitutional taking of property without compensation. We disagree. PSC's argument fails to take into account the differences recognized in the prior appropriation doctrine between water that comprises a stream's "natural flow" and storage water. See Hutchins, 1 Water Rights Laws In The Nineteen Western States, p. 603 (1971).
 
 
 39
 As a starting proposition, Colorado's Constitution guarantees its citizens that "The right to divert the unappropriated waters of any natural stream to beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using the water for the same purpose...." Colo. Const. art. XVI, Sec. 6. The Colorado Constitution thus confirmed that the doctrine of prior appropriation was the operative water law in the state, rather than the riparian doctrine that had become established in the eastern states. See Coffin v. Left Hand Ditch Company, 6 Colo. 443 (1882). Under Colorado's prior appropriation doctrine, a water right is indeed a vested property right. Ackerman v. City of Walsenburg, 171 Colo. 304, 467 P.2d 267, 270 (1970); Green v. Chaffee Ditch Company, 150 Colo. 91, 371 P.2d 775, 783 (1962); Archuleta v. Boulder & Weld County Ditch Co., 118 Colo. 43, 192 P.2d 891, 894 (1948). An interference with or taking of that right requires compensation to the owner. Farmers Irrigation Co. v. Game & Fish Comm'n, 149 Colo. 318, 369 P.2d 557, 559-60 (1962); Strickler v. City of Colorado Springs, 16 Colo. 61, 26 P. 313, 317 (1891).
 
 
 40
 In general, the storage of water for future uses is considered a beneficial use. Clark 5 Waters and Water Rights, Sec. 408.3, p. 82 (1972). Delivery of storage water to its place of use can be accomplished by either of two methods: (1) delivery through an artificial ditch or pipe, or (2) delivery through a natural stream channel. Our focus is on the second method, delivery through a natural stream channel, which generally has been recognized as a valid delivery method in the prior appropriation states. "It is elementary that a stream may be used as a part of the ditch system and that the person adding the water has the right to redivert it from the stream at the place it is needed for use." Trelease, Reclamation Water Rights, 32 Rocky Mtn.L.Rev. 464, 471 (1960). See also United States v. Haga, 276 Fed. 41, 44 (D.Idaho 1921). The statutes of the State of Colorado specifically provide for this method of storage and delivery. Title 37, Article 87 of the Colorado Statutes is entitled "Reservoirs." Section 37-87-101 grants the right to store water, and allows any post-April 18, 1935 water storage right to prevail over other rights of later priority.[4] Colo.Rev.Stat. Sec. 37-87-101 (Supp.1983). Section 37-87-102 specifically allows the owner of a reservoir to conduct storage water into natural streams for rediversion and use downstream. Colo.Rev.Stat. Sec. 37-87-102 (1973). Section 37-87-103 provides that reservoir owners who avail themselves of section 37-87-102 shall give notice to the local irrigation division engineer when a release of storage water into a natural stream is planned. This is so the responsible water officials can measure the physical parameters of the release (time of release, amount of water released, rate of release, distance between point of release and point of rediversion, etc.), calculate delivery losses, and thereby protect the interests of both the reservoir owner and the other appropriators on the stream. Colo.Rev.Stat. Sec. 3787-103 (1973). The reservoir owner who uses a natural stream to deliver stored water therefore does not abandon or lose control over the stored water when he places it in the stream for delivery, rediversion and beneficial use downstream. Sorenson v. Norell, 24 Colo.App. 470, 135 P. 119, 120 (1913); Ft. Morgan Reservoir and Irrigation Co. v. McCune, 71 Colo. 256, 206 P. 393, 395 (1922). See generally Herriman Irrigation Co. v. Keel, 25 Utah 96, 69 P. 719, 726 (1902).
 
 
 41
 If the reservoir owner does not relinquish control of his "batch" of storage water by sending it down a natural stream channel, it follows that other appropriators on the stream, even though they may be senior to the reservoir owner in priority, do not gain the right to divert that "batch" of storage water as it passes their headgates, or to make use of the storage water in any way. Their rights to divert water for beneficial use apply only to the stream's "natural flow"; they do not apply to storage water being delivered down the stream. That water has a "label" on it and is no longer public property.
 
 
 42
 The situation where a reservoir owner delivers water downstream is in contrast to the situation where storage water escapes from a reservoir inadvertently through seepage. In the latter situation, the Colorado Supreme Court has held that such seepage is merely waste, in the nature of return flow; when and if it returns to the stream it is subject to use by those appropriators with senior priority, and neither the reservoir owner nor the person who has conveyed the water into the stream through a drainage channel has any claim to it. Comstock v. Ramsay, 55 Colo. 244, 133 P. 1107 (1913); accord, Durkee Ditch Co. v. Means, 63 Colo. 6, 164 P. 503 (1917); Rio Grande Reservoir & Ditch Co. v. Wagon Wheel Gap Improvement Co., 68 Colo. 437, 191 P. 129 (1920). PSC relies heavily on Comstock v. Ramsay, supra, to support its claim that the United States loses all control over storage water from Green Mountain Reservoir's 100,000 acre-foot pool once that water is released from the dam. The Comstock case, however, is inapposite, because the storage water in question here has not been abandoned through inadvertent seepage; rather it is released, pursuant to the terms of Senate Document 80, at a controlled rate for the specific benefit of the domestic and irrigation appropriators downstream on the Colorado River.
 
 
 43
 During those times of the year when the flow of the Colorado River (even with all upstream appropriators junior to the Shoshone Plant shut down) would be less than 1250 c.f.s. were it not for the release of storage water from Green Mountain Reservoir, the Shoshone Plant, by virtue of its position on the Colorado River between Green Mountain Reservoir and the domestic and irrigation appropriators downstream in the Grand Valley, is an incidental beneficiary of the Green Mountain storage water release program. Because the owner of Green Mountain Reservoir has not objected to the Shoshone Plant's nonconsumptive use of Green Mountain's storage water while it is being delivered to the Grand Valley, the Shoshone Plant has been able to generate more electricity than it otherwise would have. To this extent the Shoshone Plant has been getting more than it is entitled to under Colorado's prior appropriation doctrine. Thus, there is no unconstitutional taking of property without compensation when the Shoshone Plant is assessed by FERC for the benefits it has been receiving as a result of the augmented stream flow caused by the release of storage water at Green Mountain Reservoir.
 
 III.
 
 44
 We next consider whether FERC is precluded by the terms of Senate Document 80 from assessing headwater benefits against the Shoshone Plant. PSC contends in this regard that Senate Document 80 explicitly provides that storage water from the 100,000 acre-foot pool at Green Mountain Reservoir is to be made available to the Shoshone Plant "without charge." Senate Document 80, contends PSC, guarantees the Shoshone Plant a minimum flow of 1250 c.f.s. between April 15 and October 15 of each year, without charge, and that this guarantee was the quid pro quo for the Western Slope water interests given in return for their permission to allow transmountain diversion of water to the Eastern Slope. Senate Document 80 has the force of a statute, and PSC contends that the document is irreconcilable with section 10(f) of the Federal Power Act, inasmuch as one statute requires the assessment of headwater benefits and the other statute prohibits such assessment. In such a case of statutory conflict, traditional rules of statutory construction come into play; and here, contends PSC, Senate Document 80 must prevail over section 10(f) because it is both the more specific statute and the later enacted statute.
 
 
 45
 FERC concedes that Senate Document 80 provides that Green Mountain storage water is to be made available at the Shoshone Plant without charge, but takes the position that a headwater benefits assessment under section 10(f) is based only on electricity generated from the water and has nothing to do with PSC's water rights at the Shoshone Plant. FERC contends that there is nothing inconsistent in recognizing PSC's "proprietary" interest in the water and in charging PSC for the use it makes of that water, namely the generation of electricity. Inasmuch as the two statutes deal with entirely different subjects, argues FERC, they are not irreconcilable and both should be given full effect. In essence, FERC's position is that, while PSC gets the water without charge, PSC can still be charged for the electricity generated from that water.
 
 
 46
 We must respectfully disagree with the positions taken by both parties. At the outset, we emphasize that we reject FERC's distinction between an appropriator's "proprietary" right to water and the appropriator's use of that water. Under the prior appropriation doctrine, a water right is a usufructuary right, and is in no sense a right of ownership of the corpus of the water itself. See, e.g., Hutchins, 1 Water Rights Laws In The Nineteen Western States, p. 151. Although the early Colorado cases have not been very clear on this point, it appears that they follow the general prior appropriation doctrine and consider a water right to be usufructuary in nature. Nichols v. McIntosh, 19 Colo. 22, 34 P. 278, 280 (1893); Wyatt v. Larimer & Weld Irrigation Co., 1 Colo.App. 480, 29 P. 906, 910 (1892), rev'd on other grounds, 18 Colo. 298, 33 P. 144 (1893); Wheeler v. Northern Colo. Irrigation Co., 10 Colo. 582, 17 P. 487, 489-90 (1888). Thus, the "proprietary" right of PSC that FERC refers to cannot be distinguished from the use made of the water, in this case the generation of electricity. FERC is forbidden by section 27 of the Federal Power Act, 16 U.S.C. Sec. 821 (1982), from affecting or interfering with state law relating to the control, appropriation, use, or distribution of water. If FERC were allowed to assess charges for the use of water to which PSC has a vested right, it would be accomplishing indirectly what it is forbidden to do directly. FERC's position is therefore rejected.
 
 
 47
 We likewise must reject PSC's position regarding the interpretation of Senate Document 80. We begin our analysis with the cardinal rule of construction that repeal of a statute by implication is disfavored. "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." Morton v. Mancari, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). See, e.g., Tennessee Valley Authority v. Hill, 437 U.S. 153, 189-190, 98 S.Ct. 2279, 2299-2300, 57 L.Ed.2d 117 (1978); United States v. Borden, 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939); Yellowfish v. City of Stillwater, 691 F.2d 926, 928 (10th Cir.1982),cert. denied, 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983); Watts v. Hadden, 651 F.2d 1354, 1381-82 (10th Cir.1981). Upon close examination of the language of Senate Document 80, we find no definite expression of intent to provide storage water from Green Mountain's 100,000 acre-foot pool to the Shoshone Plant without charge. In section (c) of the document, water from the 100,000 acre-foot pool is to be provided, without charge, for the following purposes: " to supply existing irrigation and domestic appropriations of water, including the Grand Valley reclamation project, to supply all losses chargeable in the delivery of said 52,000 acre-feet of water, and for future use for domestic purposes and in the irrigation of lands thereafter to be brought under cultivation in Western Colorado." Senate Document 80, supra at 3. The Shoshone Plant does not appear on this list. Accordingly, we are supported by the maxim expressio unius est exclusio alterius (the expression in a statute of certain powers, exceptions, designated persons or things, etc., implies the exclusion of others not mentioned) in our conclusion that there was never a specific intention that the Shoshone Plant was to receive this storage water without charge. United States v. Jones, 567 F.2d 965, 967 (10th Cir.1977); see also Sutherland, 2A Statutory Construction, Sec. 47.23, p. 194. Section (c) further provides that storage water from the 100,000 acre-foot pool is to be released between April 15 and October 15 so as to provide 1,250 c.f.s. at the Shoshone Plant; however, we consider this to be an expression only of the rate of release, not an indication that the Shoshone Plant was to receive the water without charge. We do agree with PSC that section (c) is silent with regard to headwater benefits assessments or any other charges against the Shoshone Plant, but we believe that such silence does not create the kind of patent repugnancy upon which a repeal by implication can be supported. We base our findings here on the plain language of the document, and note in passing that the legislative history of the appropriations act of 1937 which funded Green Mountain Reservoir, 50 Stat. 564, 595 (1937), is silent as to the meaning or intent of Senate Document 80. See H.Rep. 786, S.Rep. 817, Conf.Rep. 1178, 75th Cong., 1st Sess. (1937); House Debates, 81 Cong.Rec. 4353, 4508, 4512-4573, 4578-4613, 4671-4714, 4796-4815, 4849-4877; Senate Debates, 81 Cong.Rec. 6376-87, 6389, 6393. With no expression of intent in either Senate Document 80 or the legislative history that the Shoshone Plant would receive the storage water without charge, we find no preclusion or bar to the assessment of headwater benefits under section 10(f) of the Federal Power Act.
 
 IV.
 
 48
 We now consider whether PSC is obligated under section 10(f) of the Federal Power Act to reimburse FERC for costs incurred in investigating and determining the amount of headwater benefits due. The operative language from section 10(f) is the last sentence of the first paragraph: "The licensees or permittees affected shall pay to the United States the cost of making such determination as fixed by the Commission." 16 U.S.C. Sec. 803(f) (1982).
 
 
 49
 PSC contends that this language is intended to include only the upstream licensee or permittee, the party who confers the headwater benefits and receives payment for them. We find PSC's arguments in this regard unpersuasive. We choose to follow South Carolina Electric & Gas Company v. Federal Power Commission, 338 F.2d 898 (4th Cir.1964), as well as the long-standing position of the Federal Power Commission, Virginia Electric Power Co., 22 FERC p 61,351 (1983); Alabama Power Co., 13 FPC 1317 (1954); Southern California Edison Co., 5 FPC 648, 649 (1939), and hold that under section 10(f) investigative costs are properly split between both the upstream and the downstream projects, except when the upstream project is owned by the United States. Since costs may not be assessed against the United States under section 10(f), Grand River Dam Authority v. Federal Power Commission, supra, the downstream project must pay all of the investigative costs when the upstream project is federal.
 
 
 50
 Both PSC and FERC have indicated in their briefs that they have reached an agreement regarding the proper amount of the headwater benefits assessment, that agreement to be contingent on the outcome of this appeal. We have not been provided with any information on the manner in which this proposed assessment was calculated, however. FERC's original order of February 10, 1983, 18 FERC p 61,110, assessing headwater benefits, reached the correct result, but was based on incorrect legal grounds. We do not know how this may have affected the headwater benefits calculations, and we do not wish that PSC be bound to an agreement that may have been based on faulty legal assumptions. We therefore set aside FERC's order of February 10, 1983, and remand for proceedings to assess and calculate headwater benefits, consistent with this opinion.
 
 
 51
 FERC's order of December 21, 1983, 25 FERC p 61,399, finding PSC liable to reimburse FERC for its investigative costs, is affirmed, but the cause is otherwise remanded for further proceedings.
 
 
 
 [1]
 After operating with 1250 c.f.s. for several years, it was discovered in 1929 that Shoshone's gravity tunnel could accommodate 1408 c.f.s. of flow if low-pressure air was injected into the stream of water. A second water right for the additional 158 c.f.s. was obtained, with a priority date of May 15, 1929. This second water right, however, was not adjudicated until after the plans for the Colorado-Big Thompson Project and Green Mountain Reservoir were made. We will, in this opinion, refer only to the Shoshone Plant's original 1250 c.f.s. water right
 
 
 [2]
 The Act of February 15, 1901, codified at 43 U.S.C. Sec. 959, was repealed by section 706(a) of the Federal Land Policy and Management Act of 1976, Pub.L. No. 94-579, 90 Stat. 2793 (1976). Section 701 of the latter Act was a savings provision that kept all valid existing permits and rights-of-way intact. 90 Stat. 2786 (1976)
 
 
 [3]
 The duties and functions of the FPC were assumed by the Federal Energy Regulatory Commission (FERC) in 1977. See Dept. of Energy Organization Act, Pub.L. No. 95-91, 91 Stat. 565 (1977)
 
 
 [4]
 This section was amended by the Colorado legislature on April 18, 1935, 1935 Colo.Sess. Laws, p. 661, Sec. 1, in response to an April 15, 1935, decision by the Colorado Supreme Court interpreting the original language of this statute to subordinate storage rights to domestic and irrigation rights. The Court reconsidered and reversed its decision on February 3, 1936. People ex rel. Park Reservoir Co. v. Hinderlider, 98 Colo. 505, 57 P.2d 894 (1936). The priority of the individual water right now controls in Colorado, whether that right is for storage or direct flow. See Hutchins, 1 Water Rights Laws In The Nineteen Western States, p. 355