2015 CO 39

Concerning the Application for Water Rights of Charles W. Tidd and Barbara T. Tidd

David L. FREES, George A. Frees, Delmer E. Frees, and Shirley A. Frees, Plaintiffs–Appellants

v.

Charles W. TIDD and Barbara T. Tidd, Applicants–Appellees

and

Craig Cotten, Division Engineer, Appellee Pursuant to C.A.R. 1(e)

Supreme Court Case No. 14SA234

Supreme Court of Colorado.

June 1, 2015

---

Attorneys for Plaintiffs–Appellants: Lester, Sigmond, Rooney & Schwiesow Erich Schwiesow, Alamosa, Colorado

Attorneys for Applicants–Appellees: Clay and Dodson, P.C., Aaron R. Clay, Delta, Colorado

Attorneys for Amicus Curiae Rio Grande Water Users Association: Carlson, Hammond & Paddock, LLC, William A. Paddock, Mary Mead Hammond, Denver, Colorado

No appearance by or on behalf of Craig Cotten, Division Engineer.

JUSTICE HOBBS delivered the Opinion of the Court

¶ 1 This water case involving neighboring property owners in Saguache County presents an issue of first impression: · May the land owner whose property is burdened by an easement across his or her property for a water ditch obtain a junior conditional water right at the headgate of that ditch for non-consumptive hydropower use of water that the neighbor is diverting from the stream under a senior water right for irrigation use through that headgate? [1]

¶ 2 Applying the no material injury, water availability, and maximum beneficial use principles of Colorado water law, in conjunction with our decision in *Roaring Fork Club, L.P. v. St. Jude's Co.*, 36 P.3d 1229 (Colo. 2001), regarding dominant and servient interests in property burdened by a water ditch, the District Court for Water Division No. 3 issued a declaratory judgment and a conditional water right decree in the amount of 0.41 cubic feet per second ("cfs") with a 2010 priority for hydropower use to Charles and Barbara Tidd (the "Tidds") for diversion from Garner Creek in Saguache County at the headgate of Garner Creek Ditch No. 1.

¶ 3 The Plaintiffs–Appellants, David L. Frees, George A. Frees, Delmer E. Frees, and Shirley A. Frees (the "Frees"), assert that the water court lacked authority to decree this water right over their objection. They base this objection upon their ownership of a water right with an 1890 priority that diverts up to 6.4 cfs of water from Garner Creek at the headgate of Garner Creek Ditch No. 1 for irrigation use on the Frees' property.

---

1. The issue presented on appeal by Plaintiff–Appellants is: "Whether the Water court erred in decreeing an appropriation for a new use for hydropower purposes for the very same water that is appropriated under the Garner Creek Ditch No. 1 for irrigation purposes over the objection of the owner of the Garner Creek Ditch No. 1 water right."

¶ 4 The Frees own an easement across the Tidds' property for delivery of the water diverted under their 1890 water right to the Frees' land. The Frees contend that Colorado water law prevents any other person from appropriating the "same physical water as the Opposers have already appropriated through Garner Creek Ditch No. 1," despite the fact that all parties concede that the decree issued by the water court contains sufficient conditions preventing injury to the Frees' water and ditch rights. The Tidds reply that they are not appropriating the Frees' 1890 water right; instead they "will use their own separate junior water right with a 2010 priority, using Garner Creek as its source and Garner Creek Ditch No. 1 . . . as the physical delivery to their hydropower plant." The Tidds acknowledge that, at times, they will use the same "physical water after it is diverted from the natural stream into the Ditch" and they will "use a portion of the same physical Ditch, in common with Opposers." They also point out that, at other times when the Frees are not diverting and there is sufficient water in Garner Creek for exercise of their 2010 hydropower right, the Tidds' water right will operate independently of the Frees' diversion. Section 37–86–105, C.R.S. (2014), provides that no parcel of land shall be subjected to the burden of two or more water ditches through that property when one ditch will suffice.

¶ 5 The water court found that water is available for the Tidds' non-consumptive hydropower use, and the Frees cannot exclude them from that use because the Frees do not own the physical water they divert from Garner Creek. Instead they "only own the right to use that water for irrigation purposes." The water court applied our *St. Jude's* precedent to enter a declaratory judgment and decree resolving differences between these dominant and servient land owner interests. It found that the Tidds

> have the right to use and make necessary alterations to the Garner Creek Ditch No. 1 to allow them to divert water from it for hydropower purposes so long as such use and alteration does not interfere with the

quantity, quality, or timing of the water to be delivered to the Opposers under their prior water rights.

¶ 6 The water court's decree contains detailed conditions applicable to the construction, operation, and maintenance of the hydropower facility and the measurement of flows through that facility and the ditch necessary to prevent injury to the Frees' water and ditch rights. The decree states: "This decree is for non-consumptive use. Therefore, Applicants must cease use of the project if the measurements set forth above demonstrate that any water is consumed, or Applicants must augment any and all depletions through the delivery of replacement water." In this appeal, the Frees contest only the authority of the water court to enter a decree allowing the Tidds to run a portion of the Garner Creek water diverted at the Garner Creek Ditch No. 1 headgate through the Tidds' hydropower facility.

¶ 7 We defer to the water court's findings of fact and uphold its conclusions of law. Under the circumstances of this case, we hold that the water court did not err in issuing a conditional decree for a non-consumptive hydropower use water right with a 2010 priority for 0.41 cfs diverted from Garner Creek through the headgate of Garner Creek Ditch No. 1.

## I.

¶ 8 The Tidds own approximately eighty acres of land in Saguache County,[2] located in the San Luis Valley of central-southern Colorado and rich in agricultural history. The Frees own an easement for Garner Creek Ditch No. 1, which runs across the northern end of the Tidds' property. The Frees use the ditch to convey their 6.4 cfs irrigation water right with a priority date of 1890. Except during occasional high water conditions, this water right diverts the entire flow of Garner Creek from the Garner Creek Ditch No. 1 headgate during the irrigation season.

¶ 9 On November 15, 2010, the Tidds filed an application seeking a 0.41 cfs conditional

**2.** "Saguache" originates from a Ute word meaning "water at the blue earth." 2008 Saguache

County Visitor's Guide, http://www.saguache tourism.com (last visited May 27, 2015).

water right for non-consumptive hydropower use. On January 24, 2011, the Frees filed a Statement of Opposition to the proposed conditional water right. Initially, the Tidds listed the point of diversion for the hydropower right as Garner Creek Ditch No. 1, but they amended their application on June 10, 2011, to identify Garner Creek as the source of the appropriation, with the point of diversion as the headgate for the Garner Creek Ditch No. 1. To effectuate their conditional use, the Tidds will have to construct additional infrastructure in order to pipe 0.41 cfs of water from the ditch a maximum distance of 1,222 feet downhill and pass it through a flywheel connected to an alternator on the Tidds' property to generate a maximum of 3.48 kW of electricity. The entire 0.41 cfs will be returned via a discharge pipe to the ditch before the place of use of the Frees' water right.

¶ 10 During the pendency of their application, the Tidds filed a motion seeking a declaratory judgment on a question of law pursuant to C.R.C.P. 57. Specifically, the Tidds asked the water court to decide "[w]hether, and under what conditions, Applicants have a right to use a ditch on their property for hydropower purposes, despite the objection of the ditch owners." In its order, the water court characterized the question as "whether there is water available for the Applicants to appropriate at the Garner Creek Ditch No. 1 head-gate." After observing that the amended application identifies a point of diversion on Garner Creek and noting Colorado's public policy in favor of maximizing the use of a limited water supply while protecting decreed water rights, the water court found and determined that water is available at the Garner Creek Ditch No. 1 headgate for appropriation by the Tidds for their non-consumptive hydropower use. The parties subsequently crafted terms and conditions for the decree to ensure that the Tidds' 2010 appropriation will not injure the Frees' water right. On June 16, 2014, the water court entered the decree in this case, Case No. 10CW31, adopting the Findings and Ruling of the Referee, and granting the Tidds a conditional water right in the amount of 0.41 cfs from Garner Creek with the point of diversion at the Garner Creek Ditch No. 1

headgate, for non-consumptive hydropower use with a priority date of November 14, 2010. This appeal followed.

## II.

¶ 11 We defer to the water court's findings of fact and uphold its conclusions of law. Under the circumstances of this case, we hold that the water court did not err in issuing a conditional decree for a non-consumptive hydropower use water right with a 2010 priority for 0.41 cfs diverted from Garner Creek through the headgate of Garner Creek Ditch No. 1.

### A. Standard of Review

¶ 12 Whether an applicant has met the legal standards for a conditional appropriation presents mixed questions of fact and law we review de novo. *Buffalo Park Dev. Co. v. Mountain Mut. Reservoir Co.*, 195 P.3d 674, 685 (Colo.2008). We defer to the water court's findings of fact unless the evidence is wholly insufficient to support those determinations. *Id.*

### B. Applicable Law

¶ 13 In Colorado, waters of the natural stream, including tributary groundwater, belong to the public subject to appropriation through actual beneficial use. Colo. Const. art. XVI, §§ 5, 6. Colorado's long-established policy seeks to maximize the beneficial use of waters of the state. § 37–92–102(1)(a), C.R.S. (2014); *Fellhauer v. People*, 167 Colo. 320, 447 P.2d 986, 994 (1968) (noting that it is implicit in the Colorado Constitution that "there shall be Maximum utilization of the water of this state"); *High Plains A & M, LLC v. Se. Colo. Water Conservancy Dist.*, 120 P.3d 710, 718–19 (Colo.2005) ("The 'Colorado Doctrine' ... promotes multiple use of a finite resource for beneficial purposes."). To this end, Colorado strives to distribute its scarce water resources "in ways that respect historical uses without thwarting growth or entrepreneurial development." *Mount Emmons Mining Co. v. Town of Crested Butte*, 40 P.3d 1255, 1257 (Colo.2002); *see also Empire Lodge Homeowners' Ass'n v. Moyer*, 39 P.3d 1139, 1147 (Colo.2001) ("The objective of

the water law system is to guarantee security, assure reliability, and cultivate flexibility in the public and private use of this scarce and valuable resource.").

¶ 14 A water right is a right to use in accordance with its priority a certain portion of the waters of the state by reason of the appropriation of the same. § 37–92–103(12), C.R.S. (2014). A water right comes into existence through the application of water to the appropriator's beneficial use. *Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson,* 990 P.2d 46, 53 (Colo.1999). A water right is a usufructuary right: "one does not 'own' water but owns the right to use water within the limitations of the prior appropriation doctrine." *Kobobel v. Colo. Dep't. of Natural Res.,* 249 P.3d 1127, 1134 (Colo.2011). Under Colorado's prior appropriation system, water users can obtain a court decree verifying their water right. *See Empire Lodge,* 39 P.3d at 1148 ("Appropriation of natural stream waters is subject to administration in priority in accordance with judicial decrees determining the existence of water rights."). An important aspect of a water court's task is to assure the maximum beneficial use of water while adequately protecting against injury to vested water rights. *City of Thornton v. Bijou Irrigation Co.,* 926 P.2d 1, 86 (Colo.1996).

¶ 15 A conditional water right is an unperfected water right that has not yet ripened. *Natural Energy Res. Co. v. Upper Gunnison River Water Conservancy Dist.,* 142 P.3d 1265, 1277 (Colo.2006); *see also Empire Lodge,* 39 P.3d at 1147 ("[A] conditional water right holds a place in the priority system to which the water right antedates in the event the appropriator places the unappropriated water to beneficial use."). Conditional water rights encourage the pursuit of projects designed to place waters of the state to beneficial uses by reserving an antedated priority, in light of the necessity to obtain and complete financing, engineering, and the construction of works that will capture, possess, or otherwise control the water. *Dallas Creek Water Co. v. Huey,* 933 P.2d 27, 35 (Colo.1997). To obtain a conditional water right, an applicant must make a threshold showing that water is available for the proposed appropriation. *Bd. of Cnty. Comm'rs v. United States,* 891 P.2d 952, 962 (Colo. 1995).

¶ 16 Colorado is a prior appropriation state that has abolished the riparian doctrine. *Coffin v. Left Hand Ditch Co.,* 6 Colo. 443, 447 (1882). As early as the first territorial legislature, our laws recognized the right to appropriate water from the natural streams and convey it across the land of another, so that lands not immediately proximate to a stream could be developed. Colorado Territorial Laws 67 § 2 (1861). Our constitution embodied that right in article XVI, section 7, which provides:

> All persons and corporations shall have the right-of-way across public, private and corporate lands for the construction of ditches, canals and flumes for the purpose of conveying water for domestic purposes, for the irrigation of agricultural lands, and for mining and manufacturing purposes, and for drainage, upon payment of just compensation.

Our court first stressed the importance of ditch right-of-ways in *Yunker v. Nichols,* 1 Colo. 551, 555 (1872) (holding that "all lands are held in subordination to the dominant right of others, who must necessarily pass over them to obtain a supply of water"). Section 37–86–102, C.R.S. (2014), likewise authorizes the use of ditch right-of-ways:

> Any person owning a water right or conditional water right shall be entitled to a right-of-way through the lands which lie between the point of diversion and point of use or proposed use for the purpose of transporting water for beneficial use in accordance with said water right or conditional water right.

Section 37–86–105 provides that "[n]o tract or parcel of improved or occupied land ... shall be subjected to the burden of two or more ditches ... when the same object can feasibly and practicably be attained by uniting and conveying all the water necessary to be conveyed through such property through one ditch or other structure." Section 37–92–305(2), C.R.S. (2014), states that two different water rights may share a common point of diversion.

## C. Application to This Case

¶ 17 As an initial matter, we determine that the Tidds properly obtained a court declaration and decree of no material injury before making alterations to a ditch easement located on their property. To apply the water decreed for their hydropower use, the Tidds must first make several alterations to the ditch. In *Roaring Fork Club, L.P. v. St. Jude's Co.*, we held that the owner of property burdened by a ditch easement has no right to alter an easement without the consent of the benefitted owner unless he or she first obtains a declaration by a court that such alterations will cause no damage to the benefitted owner. 36 P.3d at 1239. The Frees own an easement across the Tidds' property for the ditch, and therefore the Tidds were required to show that their proposed alterations to the ditch would not injure the Frees' vested property rights. Here, the water court made a factual finding that the terms and conditions of the decree are sufficient to mitigate any injury to the Frees' water right and right-of-way property interests, and the water court retained continuing jurisdiction for reconsideration of the question of injury to the Frees' water and ditch rights. The water court's findings of fact are supported by the record. Accordingly, the Tidds complied with our directions in *St. Jude's* to obtain a declaration of the court before altering the rights associated with the ditch easement located on their property.

¶ 18 In this case, the Tidds do not attempt to appropriate the Frees' water right nor change the Frees' water right to allow the Tidds to add a use to the senior right. Instead, the Tidds applied for, and received, a conditional water right to appropriate water from Garner Creek at the ditch headgate for hydropower use. Indeed, the Tidds cannot seek to make changes to the Frees' water right–only the owner of a decreed water right may seek changes to that decree. *E. Cherry Creek Valley Water & Sanitation Dist. v. Greeley Irrigation Co.*, 2015 CO 30, ¶ 16, 348 P.3d 434; *Bd. of Cnty. Comm'rs v. Upper Gunnison River Water Conservancy Dist.*, 838 P.2d 840, 855 (Colo. 1992). Despite the Frees' characterization of the Tidds' application, the Tidds clearly did not seek to add a new use to or change the Frees' water right. Adding a new use to or changing an existing right through a change decree maintains the original priority date. *See Colo. Water Conservation Bd. v. City of Central*, 125 P.3d 424, 435 (Colo.2005). Here, the Tidds sought and received a conditional water right with a priority date of 2010, a significantly junior date compared to the Frees' senior 1890 priority date for their water right. Although the Tidds intend to use the same point of diversion on Garner Creek, and some of the same physical water as the Frees, this is not merely permissible, Colorado water law favors such multiple uses if injury to senior water rights will not occur. *See Nichols v. McIntosh*, 19 Colo. 22, 34 P. 278, 279 (1893) (observing that the same "ditch may have two or more priorities belonging to the same party or to different parties").

¶ 19 We conclude the water court did not err in decreeing the non-consumptive, noninjurious, hydropower conditional water right the Tidds sought in this case; it is legally separate and distinct from the Frees' irrigation water right. The Frees argue to the contrary that the effect of the decree is to allow the Tidds to appropriate the Frees' water. For this proposition, the Frees rely on the Tenth Circuit Court of Appeals' decision in *Public Service Co. of Colorado v. Federal Energy Regulatory Commission*, 754 F.2d 1555 (10th Cir.1985). They contend this case stands for the proposition that, once the Frees divert water from the stream to the ditch, this water has a "label" on it and cannot ever be used by others before it is applied to the Frees' beneficial use. However, that federal case is not only distinguishable, it contains self-contradictory characterizations of Colorado water law.

¶ 20 That case involved Public Service Company of Colorado's ("PSC") run of the river hydropower facility, the Shoshone Plant, on the Colorado River with an adjudicated water right of 1250 cfs and a priority date of January 7, 1902. *Id.* at 1558. Up river, the U.S. Bureau of Reclamation operates the Green Mountain Dam and Reservoir on the Blue River, a tributary of the Colora-

do River, with a direct flow water right of 1726 cfs and a storage water right of 154,645 acre-feet, both with a priority date of August 1, 1935. *Id.* at 1558, 1561. The dam and reservoir are located approximately eight miles above the confluence of the Blue and Colorado Rivers, about 100 miles upstream from the Shoshone Plant. *Id.* at 1558. When the U.S. Bureau of Reclamation releases stored water from the reservoir, it directly benefits PSC's hydropower facility by providing additional flow PSC would otherwise not enjoy under normal stream conditions. *Id.* at 1565. The Tenth Circuit held that, because PSC benefits from use of the water the United States stores and releases from Green Mountain Reservoir, the Federal Energy Regulatory Commission ("FERC") can charge PSC a "headwater benefits" fee pursuant to the Federal Power Act, 16 U.S.C. § 803(f) (1982), without running afoul of the takings doctrine. *Id.* at 1563–65.

¶ 21 In the opinion, the court problematically stated in dicta that the storage water has a " 'label' on it and is no longer public property." *Id.* at 1565. The Frees cite this language to support their assertion that water they divert at the Garner Creek Ditch No. 1 headgate "has a label on it" and therefore cannot be used by the Tidds for any purpose. However, contrary to the Frees' interpretation of this case, we understand the Tenth Circuit's decision to hold that PSC's non-consumptive use of the Green Mountain storage water through its hydroelectric facility was a sufficient basis for FERC's assessment of the headwaters benefit charge. Accordingly, *Public Service Co. of Colorado* does not support the Frees' position that the water court lacked authority to issue a decree allowing the Tidds to make a hydropower use of Garner Creek water diverted at the Garner Creek Ditch No. 1 headgate. To the contrary, PSC was making a hydropower use of Green Mountain storage water released into the Colorado River for downstream irrigation and municipal uses, including the Grand Valley Reclamation Project. *Id.* at 1565.

¶ 22 Further, while the Tenth Circuit initially mischaracterized released storage water as "no longer public property," later in the opinion it correctly stated that "a water right is a usufructuary right, and is in no sense a right of ownership of the corpus of the water itself." *Id.* at 1566; *see also Kobobel*, 249 P.3d at 1134 ("[O]ne does not 'own' water but owns the right to use water within the limitations of the prior appropriation doctrine."); § 37–92–103(12) (defining a "water right" as "a right to use in accordance with its priority a certain portion of the waters of the state by reason of the appropriation of the same").

¶ 23 Returning to the case before us, the Frees do not own the physical water they divert through the Garner Creek Ditch No. 1 headgate; instead they own the right to beneficially use the water for irrigation. The fact that the same physical water owned by the public and diverted from Garner Creek will be put to an additional use under a separate water right before reaching the Frees' place of beneficial use in no way deprived the water court of authority to issue the conditional water right decree with a 2010 priority in this case. The Frees overlook the fact that the General Assembly has provided that the public's water resource becomes "available" to an adjudicated water right either because there is unappropriated water available in a stream that is not over-appropriated or, when the affected stream is over-appropriated, the decree for the junior water right contains sufficient conditions to prevent injury to other adjudicated water rights. *See Buffalo Park Dev. Co.*, 195 P.3d at 683–86.

¶ 24 As the water court observed, in *Empire Lodge* we gave effect to the provisions of the Water Right Determination and Administration Act of 1969 (the "1969 Act"), §§ 37–92–101 to –602, C.R.S. (2014), centering on: (1) reinforcing the adjudication and administration of decreed water rights in order of their priority and (2) maximizing the use of Colorado's limited water supply for as many decreed uses as possible consistent with meeting the state's interstate delivery obligations under United States Supreme Court equitable apportionment decrees and congressionally approved interstate compacts. *Empire Lodge*, 39 P.3d at 1150. For example, augmentation plans provide a

means by which already appropriated water can be diverted and used under an adjudicated water right so long as the decree authorizing such a water right contains sufficient conditions to protect against injury to other water rights. *Id.; see also Buffalo Park Dev. Co.,* 195 P.3d at 684–85. The Frees' argument that the water court lacks authority to decree an additional appropriation unless there is unappropriated water to assign to that decree flatly contradicts the intent and provisions of the '1969 Act to foster a multiplicity of non-injurious uses. In light of over-appropriation of stream systems, flexibility in the appropriation and use of the public's water resource concurrently and in succession, without injury, is a fundamental goal of the 1969 Act. *See Empire Lodge,* 39 P.3d at 1144 n.3, 1149–50; *High Plains,* 120 P.3d at 721–22.[3]

¶ 25 Nevertheless, the Tidds cannot require the Frees to divert their irrigation water from Garner Creek. Their 2010 hydropower right must be in priority vis à vis all the users on Garner Creek to divert when the Frees are not diverting. We have stated that the "Colorado Constitution guarantees the right to use beneficially a specified amount of natural stream surface and tributary groundwater in priority under a decree, to the exclusion of all others not then in priority under a decreed water right." *Upper Eagle Reg'l Water Auth. v. Wolfe,* 230 P.3d 1203, 1210 (Colo.2010). But this right is the fundamental right to exclude those not in priority from taking actions that would injure a senior's water right, not the right to exclude others from using the same physical water when multiple rights can be served without injury. The true value of a water right is the ability to use the water beneficially in decreed priority; it does not reside in physical ownership of the public's water resource. *See Navajo Dev. Co. v. Sanderson,* 655 P.2d 1374, 1377 (Colo.1982) (observing that the value of a water right "is in its relative priority and the right to use the resource and not in the continuous tangible

possession of that resource"). Here, the parties to the case agree that the Tidds' appropriation would not injure the Frees' existing water right.

¶ 26 The Frees also argue that the Tidds may only appropriate "new water from the natural stream over that which has already been appropriated by the [Frees]." But as we discuss above, Colorado law does not require an applicant for a conditional water right, such as the non-consumptive hydropower water right in this case, to appropriate "new water"; rather, in order for an applicant to receive a conditional water right, the applicant must show that there is "available water" to be put to a beneficial use. The water court found that the availability of this water at the Garner Creek Ditch No. 1 headgate meets the water availability standards for issuance of a decree for the Tidds' non-consumptive hydropower use. The water court reasoned:

> Thus, since the [Frees'] water right is for the beneficial use of irrigation, the water right the [Frees] own when they divert water at the Garner Creek Ditch No. 1 head-gate, is the right to use a certain amount of water for the purposes of irrigation. But, they do not own the right to use that water for hydropower purposes, because the extent of their water right is determined by their beneficial use of the water, and they have not used the water for hydropower purposes nor have they obtained a decree allowing them to use the water for hydropower purposes. Accordingly, there is water available at the Garner Creek No. 1 Ditch head-gate for appropriation for the non-consumptive use of the production of hydropower.

¶ 27 The General Assembly's enactment of the "can and will" statute, section 37–92–305(9)(b), C.R.S. (2014), requires

> an applicant for a conditional water rights decree to prove the availability of water under river conditions existing at the time of the application as a threshold requirement to establishing that there is a substantial probability that the project can

---

**3.** The Frees also object that the Tidds' decree may somehow interfere with a change of water right they might apply for in the future. However, a change of water right is predicated upon a quantification of the historical consumptive use

made of the water right over a representative period of time and involves a fact-specific inquiry that must await an actual change application. *See E. Cherry Creek Valley,* ¶¶ 21–22.

and will be completed with diligence and within a reasonable time.

*Bd. of Cnty. Comm'rs v. United States,* 891 P.2d at 957; *see also Buffalo Park Dev. Co.,* 195 P.3d at 683.

¶ 28 Our previous cases make clear that whether water is available is inseparably intertwined with the question of whether a new appropriation will injure senior water rights. In *Mount Emmons Mining Co.,* we reasoned that "to satisfy the 'can and will' test, new appropriators must convince the water court that their diversion will cause no harm to senior appropriators: i.e., that water is available." 40 P.3d at 1260; *see also City of Aurora ex rel. Util. Enter. v. Colo. State Eng'r,* 105 P.3d 595, 607 n. 12 (Colo.2005) ("Surface water is overappropriated when there is not enough water in the stream during irrigation season or at other times of the year to satisfy all decreed appropriations."); *Simpson v. Cotton Creek Circles, LLC,* 181 P.3d 252, 261 (Colo.2008) (reasoning that waters in a confined aquifer were not unappropriated when new withdrawals would cause material injury to existing water rights). Under the terms and conditions of the 2010 hydropower conditional water right decree, which guards against injury to the Frees' water right, there is water available for the Tidds' decreed use.

¶ 29 Finally, the Frees argue that the Tidds will not be able to make an appropriation as defined by the Colorado Constitution and the 1969 Act. We disagree. The Tidds applied for a conditional water right to appropriate water from Garner Creek for hydropower use. "[A] conditional water right holds a place in the priority system to which the water right antedates in the event the appropriator places the unappropriated water to beneficial use." *Empire*

*Lodge,* 39 P.3d at 1147. An appropriation entails "application of a specified portion of the waters of the state to a beneficial use pursuant to the procedures prescribed by law." § 37–92–103(3)(a). The statute defines "waters of the state" as "all surface and underground water in or tributary to all natural streams within the state of Colorado." § 37–92–103(13). The decree identifies Garner Creek as the source of the water for the Tidds' appropriation. Garner Creek is a natural stream in Colorado and the Tidds intend to apply water from Garner Creek for hydropower use, which Colorado law recognizes as a legitimate beneficial use. *See Bd. of Cnty. Comm'rs v. Crystal Creek Homeowners' Ass'n,* 14 P.3d 325, 337 (Colo.2000) (citing § 37–95–103(2)).

¶ 30 Small-scale hydropower projects benefit the public because they offer an alternative source of energy that has generally minimal environmental impacts, diverts less water, is less susceptible to blackout and damage as a result of storms, and does not require the creation of dams or reservoirs because they rely on existing infrastructure.[4] Gina S. Warren, *Hydropower: Time for a Small Makeover,* 24 Ind. Int'l & Comp. L. Rev. 249, 249–50 (2014). In granting the Tidds' non-consumptive conditional water right application, the water court followed Colorado law allowing the public's scarce water resource to be put to multiple beneficial uses while protecting decreed senior water rights.[5]

### III.

¶ 31 Accordingly, we affirm the water court's entry of the conditional water right decree in Case No. 10CW31.

JUSTICE MÁRQUEZ dissents, and JUSTICE COATS joins in the dissent.

---

4. In 2010, Colorado signed a Memorandum of Understanding with the Federal Energy Regulatory Commission to streamline and simplify the authorization of small-scale hydropower projects in Colorado. *See* Fed. Energy Regulatory Comm'n, Memorandum of Understanding Between the Federal Energy Regulatory Commission and the State of Colorado Through the Governor's Energy Office to Streamline and Simplify the Authorization of Small Scale Hydropower Projects (2010).

5. The Tidds ask this court to rule on when they must submit an application for a finding of rea-

sonable diligence. We direct the Tidds to section 37–92–301(4)(a)(I), C.R.S. (2014), which states:

> In every sixth calendar year after the calendar year in which a water right is conditionally decreed, or in which a finding of reasonable diligence has been decreed, the owner or user thereof, if such owner or user desires to maintain the same, shall file an application for a finding of reasonable diligence, or said conditional water right shall be considered abandoned.

JUSTICE MÁRQUEZ, dissenting.

¶ 32 In this case, the majority recognizes, for the first time, a conditional right to appropriate the same physical water previously decreed to, and being diverted by, another appropriator. The applicants' proposed diversion of this water to generate hydroelectric power for household use is both creative and, by all appearances, environmentally sound. However, as a practical matter, the applicants' use of this water relies entirely upon a diversion under a more senior priority—indeed, the applicants seek to intercept a portion of the very water diverted under a senior irrigation right. In other words, these applicants have been decreed a conditional right with a 2010 priority but will access the water only because other appropriators are diverting it under an 1890 priority. In my view, the majority's recognition of this novel conditional water right runs contrary to our time-honored prior appropriation doctrine, see *Kobobel v. State*, 249 P.3d 1127, 1134 (Colo.2011), and is not authorized under current law. Accordingly, I respectfully dissent.

¶ 33 The Opposers ("the Frees") hold a decreed right under an 1890 priority to divert up to 6.4 cfs of water from Garner Creek for irrigation. The Frees divert this water from a headgate on Garner Creek into Garner Creek Ditch No. 1, which the Frees own. This ditch runs across the Applicants' ("the Tidds") property before it reaches the Frees' land. Garner Creek Ditch No. 1 serves no other water rights. Indeed, it is undisputed that when water flows into this ditch, it is flowing solely to irrigate land owned by the Frees. During irrigation season, the Frees' water right in Garner Creek Ditch No. 1 takes the entire flow of Garner Creek, absent occasional high water conditions.

¶ 34 The Tidds have sought a conditional right to intercept 0.41 cfs of water as it flows through Garner Creek Ditch No. 1, pipe this water 1222 feet downhill to generate up to 3.48 kW of electricity for household use, and then return it to the ditch at a lower eleva-tion. The Tidds' initial application sought to divert this water directly from Garner Creek Ditch No. 1. After the Frees objected on grounds that an appropriator can only take water from a "natural stream" (and not a ditch), the Tidds amended their application to identify the diversion point for their conditional right as the Garner Creek Ditch No. 1 headgate on Garner Creek.

¶ 35 In theory, the Tidds propose to divert water from Garner Creek and convey it through Garner Creek Ditch No. 1 to their pipe intake. Importantly, however, the Tidds acknowledge that they do not seek to divert additional, unappropriated water from Garner Creek. That is, they do not intend to divert an additional 0.41 cfs from the creek beyond the 6.4 cfs decreed to the Frees for irrigation. Rather, the water court's order makes clear that the Tidds propose to intercept a portion of the 6.4 cfs of water already decreed to the Frees for irrigation, *after the Frees have diverted this water from the natural stream into Garner Creek Ditch No. 1 under their 1890 priority*. Thus, although the Tidds' conditional right ostensibly carries a 2010 priority, they propose to use the water actually diverted by senior appropriators under their 1890 priority. Under the majority's holding, a new appropriator can effectively divert water out of priority by engrafting a non-consumptive use on the same physical water that a senior appropriator is already diverting.

¶ 36 The majority acknowledges that the Tidds' 2010 hydropower right "must be in priority vis à vis all the users on Garner Creek to divert *when the Frees are not diverting*." Maj. op. ¶ 25 (emphasis added). But as a practical matter, their 2010 priority "vis à vis all the users on Garner Creek" will be inconsequential. The Tidds admit in their briefing to this court that the 0.41 cfs conditionally decreed to them for hydroelectric power use might not be sufficient to reach their pipe intake were the Tidds to divert it themselves from Garner Creek.[1] Thus, the Tidds presumably will be able to intercept

1. Thus, when the Frees are *not* diverting (e.g., during non-irrigation season), it is difficult to imagine how the Tidds could actually put their decreed water to beneficial use, even assuming that there was sufficient water in Garner Creek at such times to satisfy their 0.41 cfs right under their 2010 priority.

0.41 cfs of water from the ditch only when the Frees *are* diverting—under their 1890 irrigation priority. In short, the majority's holding permits a new appropriator to intercept water that is "available" only by virtue of a senior appropriator's diversion. By piggybacking on the senior appropriator's diversion, the new, junior appropriator effectively gains an overvalued water right by "diverting" under an earlier priority date.

¶ 37 Under the Colorado Constitution, the water of every natural stream within the state is the property of the public and is dedicated to the use of the people, subject to appropriation as provided by law. *See Shirola v. Turkey Cañon Ranch Ltd. Liab. Co.,* 937 P.2d 739, 747–48 (Colo.1997) (citing Colo. Const. art. XVI, § 5). We have made clear that a water right is a usufructuary right, giving its holder the right to use and enjoy this public resource. *See Navajo Dev. Co. v. Sanderson,* 655 P.2d 1374, 1377 (Colo.1982). Thus, although a water right is a property right, *Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson,* 990 P.2d 46, 53–54 (Colo. 1999), "one does not 'own' water but owns the right to use water *within the limitations of the prior appropriation doctrine," Kobobel,* 249 P.3d at 1134 (emphasis added); *see also* maj. op. ¶ 14.

¶ 38 Given the demand for water, there is no guarantee that sufficient water will be available to satisfy all claims to this scarce resource. *Kobobel,* 249 P.3d at 1134–35. Accordingly, this court has recognized that the primary value of a water right lies " 'in its relative priority.' " Maj. op. ¶ 25 (quoting *Navajo Dev. Co.,* 655 P.2d at 1377); *see also Colo. Water Conservation Bd. v. City of Central,* 125 P.3d 424, 434 (Colo.2005). Indeed, the very definition of a water right under the 1969 Water Right Determination and Administration Act is the "right to use *in accordance with its priority* a certain portion of the waters of the state by reason of appropriation of the same." § 37–92–103(12), C.R.S. (2014) (emphasis added); *see also Empire Lodge Homeowners' Ass'n v. Moyer,* 39 P.3d 1139, 1147 (Colo.2001) (explaining that a water right is a right "to use in accordance with its priority a certain portion of the waters of the state"). Specifically, "[t]he Colorado Constitution guarantees the right to use beneficially a specified amount of [water] *in priority* under a decree, *to the exclusion of all others not then in priority* under a decreed water right." *Upper Eagle Reg'l Water Auth. v. Wolfe,* 230 P.3d 1203, 1210 (Colo. 2010) (emphasis added); *see also Empire Lodge,* 39 P.3d at 1147.

¶ 39 The majority emphasizes that a water court must assure the "maximum beneficial use" of water. Maj. op. ¶¶ 2, 14. But this principle must be applied in conjunction with the prior appropriation doctrine; it cannot trample it. To the extent that the legislature has recognized the need for flexibility, it has expressly authorized certain forms of out-of-priority diversions, such as those in compliance with the augmentation plans described by the majority. *See id.* at ¶ 24. My point is simply that the exceptions to the prior appropriation doctrine noted by the majority all have been recognized and codified by the legislature, whereas the exception created by the majority today has not.

¶ 40 As explained above, I believe that the operation of this conditional decree runs contrary to our prior appropriation doctrine. The Tidds, as new appropriators, will be intercepting a portion of water that senior appropriators are diverting under an 1890 priority. As the majority recognizes, if the Tidds were actually diverting an additional 0.41 cfs from Garner Creek under their 2010 priority, their right would be subordinate to all senior appropriators on that creek. *Id.* at ¶ 25. Instead, the Tidds, as new appropriators, have acquired a conditional right to intercept and use the very water being diverted by other appropriators under those appropriators' decreed 1890 priority. This arrangement is troubling and, in my view, does not meet the requirements for a new appropriation.

¶ 41 Importantly, "[t]he right guaranteed under the Colorado Constitution is to the appropriation of unappropriated waters of the natural stream, not to the appropriation of appropriated waters." *Empire Lodge,* 39 P.3d at 1147 (citing Colo. Const. art. XVI, §§ 5, 6). We have made abundantly clear that a water right is created when one appropriates previously "unappropriated waters of

the natural stream" by "placing the unappropriated water to beneficial use." *Id.; see also Trail's End Ranch, L.L.C. v. Colo. Div. of Water Res.*, 91 P.3d 1058, 1061 (Colo.2004) ("Rights to the waters of the natural surface streams of this state are acquired by appropriating previously unappropriated water and putting it to beneficial use."); *Shirola*, 937 P.2d at 748 ("A water right is created when a person appropriates or initiates an appropriation of unappropriated water of a natural stream of the state.").

¶ 42 An applicant seeking a conditional water right "must prove that unappropriated water is available based upon conditions existing at the time of the application, in priority, in sufficient quantities, and on sufficiently frequent occasions to enable the applicant to complete the appropriation with diligence and within a reasonable time." *Buffalo Park Dev. Co. v. Mountain Mut. Reservoir Co.*, 195 P.3d 674, 683 (Colo.2008). Courts should calculate availability of unappropriated water based on historic beneficial use of perfected water rights. *Id.* Rather than require the Tidds to prove that an additional 0.41 cfs of unappropriated water was available in Garner Creek for their use, the majority instead holds that unappropriated water is "available" so long as a new appropriation will not injure senior water rights. Maj. op. ¶ 28. Indeed, the majority cites *Buffalo Park* to suggest that water becomes "available" so long as "the decree for the junior water right contains sufficient conditions to prevent injury to other adjudicated water rights." *Id.* at ¶ 23 (citing *Buffalo Park*, 195 P.2d at 685). However, it relies on the section of the *Buffalo Park* opinion discussing the statutory requirements for *augmentation plans. See id.* As stated above, the legislature has expressly recognized and codified certain exceptions to the prior appropriation doctrine, such as augmentation plans. The conditional decree here is not for a diversion under an augmentation plan. And while the legislature may wish to extend the principles of augmentation plans to the type of arrangement proposed by the applicants here, to date, it has not.

¶ 43 I find the remainder of the majority's analysis equally unconvincing. The majority asserts that "[o]ur previous cases make clear that whether water is available is inseparably intertwined with the question of whether a new appropriation will injure senior water rights." Maj. op. ¶ 28. The majority cites *Mount Emmons Mining Co. v. Town of Crested Butte*, 40 P.3d 1255, 1260 (Colo.2002), for this proposition. Maj. op. ¶ 28. In *Mount Emmons*, this court observed that, typically, applicants for a conditional water right "must convince the water court that their diversion will cause no harm to senior appropriators: i.e., that water is available." 40 P.3d at 1260. The syllogism evident in this statement is that, if unappropriated water is available, then the applicant's proposed new diversion will not harm senior appropriators. Yet the majority turns this logic on its head and effectively holds that, if a new diversion will not harm senior appropriators, then water is available for the new appropriation. Maj. op. ¶ 28. I fail to grasp how *Mount Emmons* supports the majority's conclusion. Notably, the two cases cited in *Mount Emmons* for the proposition quoted by the majority both emphasize an applicant's obligation to demonstrate the availability of unappropriated water. 40 P.3d at 1260 (citing *Se. Colo. Water Conservancy Dist. v. City of Florence*, 688 P.2d 715, 718 (Colo. 1984) (rejecting conditional decree applicants' argument that they need not show the availability of unappropriated water);[2] *Empire Lodge*, 39 P.3d at 1148 ("The applicant for issuance of a conditional decree bears the burden of demonstrating that there is unappropriated water available for the appropriation, taking into account the historic exercise of decreed water rights.")).

¶ 44 I also disagree with the majority's attempts to distinguish *Public Service Co. of Colorado v. FERC*, 754 F.2d 1555 (10th Cir. 1985). *See* maj. op. ¶¶ 20–22. In that case, Public Service Co. ("PSC") held an adjudicat-

---

**2.** In *Southeastern Colorado Water Conservancy District*, this court similarly indicated that, if an appropriator replaces water according to an augmentation plan, a new out-of-priority diversion will not injure senior appropriators. 688 P.2d at 718. However, the court did not suggest the reverse; i.e., where a new appropriator establishes water non-injury to senior appropriators, a new appropriation can be decreed regardless of the availability of unappropriated water.

ed right to use 1250 cfs of water in the Colorado River to generate electricity at its Shoshone Hydroelectric Plant. *Pub. Serv. Co. of Colo.*, 754 F.2d at 1558. Upstream from the Shoshone plant, the Bureau of Reclamation operated Green Mountain Reservoir, a water storage facility on the Blue River, which is tributary to the Colorado River. *Id.* Green Mountain Reservoir is part of the Colorado-Big Thompson Project, an elaborate system of reclamation facilities authorized and funded by Congress to divert water from Colorado's western slope across the continental divide to the front range. *Id.* Water is released from the reservoir in sufficient quantity to maintain the specified flow of 1250 cfs for operation of the Shoshone plant. *Id.* at 1559–60. At issue in *Public Service Co. of Colorado* was whether the Federal Energy Regulatory Commission ("FERC") could assess PSC for "headwater benefits"—that is, for increased flow in the river created by the controlled release of storage water that "allow[ed] a downstream hydroelectric facility to generate more electric power than would otherwise be possible." *Id.* at 1561. The Tenth Circuit held that such an assessment is not an unconstitutional taking. *Id.* at 1565.

¶ 45 The majority here points out that PSC was allowed to divert the released storage water to its hydroelectric plant for non-consumptive use as this water was being delivered to other downstream appropriators, much as the Tidds seek to do here. Maj. op. ¶ 21. That fact alone, however, misses the key holding of *Public Service Co. of Colorado*: FERC's assessment for headwater benefits was not an unconstitutional taking of property *because PSC had no vested water right in the additional storage water being released from Green Mountain Reservoir—* even for a non-consumptive use such generating hydroelectric power. *See* 754 F.2d at 1565. The release of the additional storage water for delivery to other downstream appropriators augmented the stream flow in excess of the 1250 cfs decreed to the Shoshone plant. *Id.* Because PSC was able to use this augmented flow to generate more electricity than it otherwise could have, it was "getting more than it [was] entitled to under Colorado's prior appropriation doc-

trine." *Id.* In short, this case stands for the proposition that a downstream user cannot obtain a vested water right in already appropriated water simply by applying that water to a beneficial, non-consumptive use.

¶ 46 I am also concerned about the potential policy implications of the majority's holding. I fear that this holding could lead to unforeseen complications. What happens, for example, if the Frees wish to change the point of diversion for their Garner Creek Ditch No. 1 water right at some point in the future? If doing so would impact the availability of water for the Tidds' hydroelectric water right, is this "injury" sufficient to preclude such a change to the Frees' water right? In other words, what obligations do the Frees now have to avoid injury to the Tidds (or to a future holder of the Tidds' hydroelectric power right)? It is unclear what obligations the Frees will need to meet to avoid injury to the Tidds in a change case, given that the Tidds' conditional water right intercepts a portion of the water that the Frees divert from Garner Creek under their 1890 priority. *See Weibert v. Rothe Bros.*, 200 Colo. 310, 618 P.2d 1367, 1371 (1980) (stating that the right to change the point of diversion "is qualified in that injury to others must not result from the change"). Even assuming that the Frees have no obligation to avoid injury to the Tidds if they change their point of diversion, the ramifications of the majority's holding, when applied on a larger scale, are still troubling. Should the Frees change their point of diversion, a permanent shutdown of the Tidds' small-scale hydroelectric power project would be unlikely to cause the Tidds serious harm. However, one can imagine a situation in which a large hydroelectric plant with water rights to intercept a senior appropriator's diversion of water would have to be taken offline when the senior appropriator decides to divert its water farther downstream. A shutdown in this scenario could have significant impacts on both the plant owner and the public.

¶ 47 Finally, I note that many of the conditions imposed in this case to ensure that the Tidds' use of Garner Creek Ditch No. 1 does not "interfere with the quantity, quality, or timing of the water to be delivered to the

Opposers under their prior water rights," maj. op. ¶ 5, arise because the senior appropriators hold a ditch easement on the new appropriators' property. However, the majority's holding is not in any way limited to the unique facts presented here.

¶ 48 To be sure, the Tidds' proposed hydropower use appears to be a creative, environmentally beneficial application of the waters of this state that may well advance the policy goals of Colorado water law. Whatever the desirability of this particular project, however, the conditional water right decreed in this case is, in my view, incompatible with our system of prior appropriation as it currently stands. This court should defer to the judgment of the legislature on whether to allow such novel, out-of-priority diversions, rather than upholding a conditional water right in the unique circumstances of this case and thereby establishing potentially dangerous precedent. Accordingly, I respectfully dissent.

I am authorized to state that JUSTICE COATS joins in this dissent.